**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Bienvenido DUARTE, Defendant–Appellant.**

No. 91–1203.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1991.

Decided Dec. 10, 1991.

Stephen J. Liccione, Asst. U.S. Atty. (argued), Milwaukee, Wis., for plaintiff-appellee.

Thomas L. Shriner, Jr., Jeffrey N. Costakos (argued), Foley & Lardner, Milwaukee, Wis., for defendant-appellant.

Before WOOD, Jr., FLAUM and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

A jury convicted Bienvenido Duarte of one count of conspiracy to distribute over one kilogram of cocaine, and one count of possession with the intent to distribute over one kilogram of cocaine. The district court, pursuant to the Sentencing Guidelines, sentenced him to two concurrent 180 month terms of imprisonment. Here, Duarte appeals both his conviction and sentence. We affirm his conviction, but vacate his sentence and remand for resentencing.

## I.

Duarte challenges his conviction on sufficiency of the evidence grounds. He concedes that a conspiracy to distribute cocaine existed, but contends that the government failed to produce sufficient evidence linking him to the conspiracy.[1] We review the record, necessarily in some degree of detail, before considering the merits of this claim.

## A.

On June 22, 1990, a confidential informant notified the Milwaukee police department that several individuals from New York, including Duarte, had arrived in Milwaukee with approximately one kilogram of cocaine. The informant advised the police that these individuals were staying in Room 234 of a particular Howard Johnson's motel.

Detectives Thomas Gorecki and Alan Wilke proceeded to the motel where they found, parked outside Room 234, a grey 1983 Chevrolet with New York license plates. A call to New York authorities established that the plates were not registered to this car, but rather to a yellow 1981 Chevrolet. The detectives then decided to set up surveillance and investigate further. They learned from a Howard Johnson's employee that Room 234 was registered to a Maria Gonzales of 1516 Wright Street in Milwaukee. This information also failed to check out, as the address corresponded to a vacant, boarded up home.

About an hour after Gorecki and Wilke arrived, a man later identified as Modesto Arroyo emerged from the Howard Johnson's, got into the Chevrolet, and drove in an "erratic" fashion—according to the detectives, who followed him—to a nearby Exel Inn. Arroyo stayed at the Exel for about two hours, after which he drove, again in an erratic fashion, back to the Howard Johnson's. The detectives testified that Arroyo made four such trips between the motels. Once, upon returning to the Howard Johnson's, Arroyo threw something at the glass door or window of Room 234.

Milwaukee police aborted what turned out to be Arroyo's last trip of the day when they stopped him as he was driving away from the Howard Johnson's. The police found a key to Room 207 of the Exel in the car. Gorecki and Wilke, accompanied by members of the tactical enforcement unit, proceeded to the Exel and opened the door to Room 207. From the hallway the officers saw a large white chunk on a sheet of plastic, a chunk they surmised (correctly, as laboratory tests subsequently determined) was cocaine. After securing the room,[2] the detectives, along with five uniformed officers, returned to the Howard Johnson's, where they knocked on the door of Room 234. A man who identified himself as Antonio de la Cruz opened the door

---

1. Duarte also concedes that if we uphold his conspiracy conviction, we must also uphold the possession conviction pursuant to *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). App.Br. at 8 n. 2.

2. Although the detectives remained in the hallway, two members of the tactical enforcement unit entered the room to determine whether any other suspects were present. Duarte did not challenge this warrantless entry at trial, and does not do so here.

and admitted the officers. Duarte was also in the room at the time.

The detectives asked Duarte for permission to search the room, and Duarte consented. The police recovered several items, including a number of airline ticket receipts, a boarding pass in Duarte's name for a flight from Boston to Milwaukee in March, a receipt for jewelry bought in Milwaukee in April, five $100 bills and some other cash. More important, they seized a telephone beeper from Duarte, and found in his wallet three pieces of paper with various names, numerical entries, and words in Spanish. Duarte also produced a Massachusetts driver's license which the State of Massachusetts claims never to have issued.

Upon questioning at the motel, Duarte explained that he managed Latino music acts and was in town to book gigs for his clients. He maintained that he had been in Milwaukee for several days, but was able to name only one nightclub in the Milwaukee area, and could not identify any of his clients. In addition, Duarte claimed to have made only a few phone calls during his stay. His motel bill, however, demonstrates that over 60 local calls, and approximately 100 calls overall, were placed from his room.

The police then obtained a search warrant for Room 207 of the Exel. The search yielded 1.177 kilograms of cocaine and some cocaine dealing paraphernalia, including a roll of wax paper, a box of plastic storage bags, a strainer, and a hand-held gram scale. Duarte was arrested and charged with conspiracy to distribute cocaine and possession with the intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2.

At trial, several witnesses for the government—including Gorecki and Wilke, other law enforcement officials involved with the investigation, and an employee of the Howard Johnson's—testified as to the preceding facts. The government also called Special Agent William C. Hehr of the Drug Enforcement Agency, who, while not involved with the investigation, testified as an expert on the operation of drug rings and, more important, analyzed the three slips of paper found in Duarte's wallet. (A handwriting expert testified that the handwriting on the papers was Duarte's.) Hehr testified that, in his opinion, the three slips of paper were "drug notes" that recorded various cocaine transactions in a crude, but disguised manner. While the drug notes did not refer to drugs per se, they listed names next to numbers in a ledger-like manner, and contained words such as "minus," "two parts," "makes," "credit," and "debt." In addition, some numbers were consistent with the price of cocaine during the time the conspiracy was alleged to have operated.[3] Hehr stated that the notes demonstrated that Duarte controlled $117,000 worth of cocaine.

At the close of the government's case, the defense rested without calling any witnesses. The jury convicted Duarte on both the conspiracy and the possession counts.

## B.

■ To procure a valid conspiracy conviction, the government must demonstrate that (1) a conspiracy to distribute cocaine existed, and (2) the defendant knew of the conspiracy and agreed to "join and associate himself with its criminal design and purpose." *United States v. Auerbach*, 913 F.2d 407, 414–15 (7th Cir.1990); *see also United States v. Ruiz*, 932 F.2d 1174, 1179 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991); *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir.1991). As noted above, Duarte concedes the first element, and, moreover, does not claim that he was ignorant of Arroyo's drug-related activities. His sole contention is that the government did not proffer sufficient evidence to prove that he joined the conspiracy.

3. Hehr testified, in part, as follows:
   [Y]ou have got 70 equals, the word sinta, and then 70 sinta at 850 and then the number 59,500 below it. Well, 70 ounces of cocaine were going for $850 an ounce. If you multiply 70 ounces times 850, the answer is going to be 59,500.
   Tr. at 130.

Defendants advancing sufficiency of the evidence claims face a heavy burden; we deny such claims if, "after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)). When, as here, a defendant challenges the sufficiency of the evidence linking *him* to an existing conspiracy, we will sustain a verdict of guilt if there is "substantial evidence" in the record of the defendant's agreement to participate, and actual participation, in the conspiracy. *Ruiz*, 932 F.2d at 1179; *Auerbach*, 913 F.2d at 414.

■ At the outset, we emphasize that a defendant's "mere knowledge of, approval of, association with, or presence at a conspiracy" is not sufficient to establish participation therein. *United States v. Durrive*, 902 F.2d 1221, 1225 (7th Cir.1990). Agreement is the essence of conspiracy; nobody may be convicted of the offense unless the government proves that he agreed to join or participate in a criminal enterprise. *Townsend*, 924 F.2d at 1390. It is simply not enough to prove that the defendant hung out with criminals, knowingly witnessed the execution of a conspiratorial plot, or even wished the conspirators success. *See United States v. Atterson*, 926 F.2d 649, 655–56 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991).

The government's case against Duarte skates very close to this line. There is no direct evidence in the record that Duarte ever agreed to do anything in furtherance of Arroyo's criminal activities. None of Duarte's alleged co-conspirators—including Arroyo, the only participant affirmatively linked to the cocaine recovered at the Exel—testified at trial that Duarte participated in the conspiracy. No witnesses testified that Duarte bought cocaine from or sold cocaine to them, or that they saw Duarte deal cocaine. The government did

not record any of the phone calls originating from Room 234 of the Howard Johnson's, phone calls that might have demonstrated Duarte's participation in the cocaine dealing enterprise. The police did not find any cocaine or related paraphernalia (*e.g.*, scales, plastic baggies) at the Howard Johnson's. No evidence suggests that Duarte was ever at the Exel, or that he called the Exel from his room at the Howard Johnson's.

■ This lack of direct evidence, while hardly ideal, does not compel reversal of Duarte's conviction. A defendant's agreement to join a conspiracy may be proved entirely by circumstantial evidence: "[i]f the prosecution presents enough circumstantial evidence to support, beyond a reasonable doubt, an *inference* that the defendant[ ] agreed ... to distribute drugs, a jury would be justified in convicting [him]." *Townsend*, 924 F.2d at 1390 (emphasis in original); *see also United States v. Troop*, 890 F.2d 1393, 1397 (7th Cir.1989). Having said this, we examine the evidence in the light most favorable to the government. Doing so elicits three crucial deductions.

First, Duarte's presence in Room 234 of the Howard Johnson's, while not enough to support a conviction in and of itself, constitutes a direct link to Arroyo and hence an indirect link to the cocaine recovered at the Exel. Arroyo emerged from and returned to the area of the Howard Johnson's where Room 234 was located throughout the day. He drove the car that was parked outside Room 234, and communicated with the occupants of Room 234 by throwing something at the room's door. Moreover, the fact that over 100 calls were placed from Room 234 within a period of days is not inconsistent with the activities of a cocaine distribution ring.

Second, Hehr's interpretation of the drug notes, coupled with the testimony of the handwriting expert, is evidence that Duarte recorded actual cocaine transactions, affirmatively tying him to the cocaine trade. Although, as we explain below, nothing in the drug notes suggests that the transactions recorded therein took place in Milwaukee, the notes could suggest that Duarte

was in league with Arroyo. Also tying Duarte to the drug trade is his possession of a telephone beeper, which, in conjunction with the drug notes, could justifiably raise the eyebrows of a reasonable juror.[4] *See United States v. Solis*, 923 F.2d 548, 550–51 (7th Cir.1991) (recognizing that beepers are common tools in drug rings).

Finally, Duarte's (inept) prevarications and other evasive tactics create a cloud of suspicion surrounding his presence in Milwaukee, and could cause a reasonable juror to ask the following questions. If Duarte were, as he claimed, a music agent in town to book gigs for his clients, why could he name only one nightclub in Milwaukee? Why couldn't he name any of the acts he supposedly managed? Also, why did Duarte lie about the number of phone calls placed from his room at the Howard Johnson's?[5] The false address under which Room 234 was registered, the fact that the license plates on the car outside Room 234 belonged to a different car, and the bogus Massachusetts driver's license Duarte produced are also problematic. The fact that most everything about Duarte's identity failed to check out could certainly lead a reasonable juror to believe that Duarte was trying to hide something, and to infer that this "something" was his participation in the cocaine conspiracy.

In sum, while there is no direct evidence that Duarte agreed to join the conspiracy, circumstantial evidence (1) links Duarte to Arroyo, and thus the cocaine recovered at the Exel, (2) links Duarte to the cocaine trade in general, and (3) suggests that Duarte had something to hide. It is unlikely that any of these links or suggestions, taken alone, could support a guilty verdict. However, on appeal, it is important "that we not rend the fabric of evidence and examine each shred in isolation." *Durrive*, 902 F.2d at 1229 (citations omitted). On the contrary, we must, as the jury did, view the evidence as a whole. Moreover, we must draw all reasonable inferences in favor of the prosecution. The fact that plausible, innocent explanations of Duarte's behavior were available to the jury is of little moment in an appellate court. *See United States v. Jackson*, 935 F.2d 832, 843 (7th Cir.1991) (citing cases).

Viewing the evidence in this light, we cannot say that a reasonable jury, drawing upon its common sense, *Troop*, 890 F.2d at 1397, could not have inferred that Duarte conspired with Arroyo to distribute cocaine in Milwaukee.

### C.

Before proceeding, we must briefly address Duarte's objection to the use of agent Hehr's interpretation of the drug notes to support the conviction. Duarte concedes that Hehr's opinions were admissible at trial—a concession we find wise, *see United States v. Cagle*, 922 F.2d 404, 407 (7th Cir.1991) and *United States v. de Soto*, 885 F.2d 354, 362–63 (7th Cir.1989)—but argues that they "cannot substitute for evidence of knowledge and intent sufficient for conviction." App. Br. at 12. We understand Duarte to contend that, as a matter of law, the government may not use expert testimony branding a defendant's conduct criminal to establish a prima facie case of guilt either at trial or on appeal.

In support of his contention, Duarte points us to a line of cases from the Second Circuit, including *United States v. Brown*, 776 F.2d 397, 401 (2d Cir.1985) (officer, who posed as a buyer, testified that defendant's behavior indicated that he was a "steerer" who screened officer on behalf of a drug dealer), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *United States v. Young*, 745 F.2d 733 (2d Cir.1984) (officer testified that defendants' surrepti-

---

**4.** Plausible alternate inferences are available; Duarte claims that "beepers are also commonly used by law-abiding citizens—including music agents." App.Br. at 11. While this is certainly the case, we must, on a sufficiency of the evidence appeal, examine the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor.

**5.** Duarte attempts to deflate the probative value of his unconvincing answers by claiming that his limited knowledge of English prevented him from understanding or adequately responding to the questions posed by Gorecki. App.Br. at 11. The jury, however, apparently chose not to believe Duarte, and we cannot revisit the question here.

tious behavior at a hotel indicated that he was in on a drug transaction, even though actual transaction occurred out of sight of officer), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United States v. Sette,* 334 F.2d 267, 268–69 (2d Cir.1964) (agents testified that defendant's conduct indicated that he was the "banker" of a gambling operation); and *United States v. Jones,* 605 F.Supp. 513 (S.D.N.Y.1984) (officer testified that defendant was acting as a "look-out" for a drug deal occurring inside of a building). Of these, Judge Newman's concurrence in *Young,* and *Jones,* a district court case relying on this concurrence, are most significant; they hold (in Judge Newman's case, propose) that an expert's personal opinion that certain ambiguous conduct constitutes criminal behavior should be given little, if any, weight in assessing the sufficiency of the evidence. The Second Circuit formally adopted Judge Newman's proposal in *United States v. Boissoneault,* 926 F.2d 230, 234–35 (2d Cir.1991), when it overturned a conviction on sufficiency of the evidence grounds.

At oral argument, the government maintained that *Boissoneault* is flawed. It is unnecessary to address the issue here, for the rule announced therein is inapposite to this case. *Boissoneault* and its predecessors direct their fire towards experts who testify that a defendant's ambiguous *physical conduct* constituted criminal behavior, or who deduce from certain physical evidence that a defendant possessed a criminal state of mind. In *Jones,* for example, the government's case consisted in large part of the investigating officer's testimony that, in his opinion, the defendant's presence near the scene of a drug transaction and brief conversation with the dealer demonstrated that he was acting as a lookout for that particular transaction. *Jones,* 605 F.Supp. at 516. Similarly, the expert in *Boissoneault* testified that the defendant's possession of cocaine in druggist folds and $1,460 in ten and twenty dollar bills suggested that he intended to deal cocaine rather than keep it for his own personal use. *Boissoneault,* 926 F.2d at 234–35.

Hehr's testimony is different in two important respects. First, he did not opine as to Duarte's ambiguous *physical conduct* (there was none on which to opine), but only interpreted ambiguous *written documents* seized from him. Both the Second Circuit and this Court have expressed far more concern over the former type of testimony than the latter. *See id.* at 233; *United States v. Diaz,* 878 F.2d 608, 619–20 (2d Cir.), *cert. denied,* 493 U.S. 993, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989); *de Soto,* 885 F.2d at 359–63. Second, and equally important, Hehr's testimony was limited to explaining "the likely drug transaction-related significance of" the drug notes, and left to the jury the task of inferring that Duarte was a member of Arroyo's cocaine conspiracy—a critical distinction under the Second Circuit's analysis. *See Boissoneault,* 926 F.2d at 233.

The distinction between these two species of expert testimony is implicit in another case from the Second Circuit, *Diaz, supra,* that upheld a conviction based upon evidence markedly similar to the evidence marshalled against Duarte. In *Diaz,* an expert testified that ledgers found in defendants' house recorded drug transactions. The court held that this testimony, coupled with the seizure of cocaine from parties other than defendants, could provide the basis for the jury's determination that defendants were involved in a cocaine conspiracy. *Diaz,* 878 F.2d at 619–20.

In sum, we hold that the jury could properly rely upon Hehr's testimony in evaluating whether Duarte was involved with Arroyo's drug-related activities. We leave open the question of whether *Boissoneault* accurately reflects the law of this circuit; we only find here that it does not apply to the facts of this case.

## II.

Duarte also challenges the sentence imposed upon him by the district court. He contends that the court misapplied the Sentencing Guidelines by assigning to him a base offense level inconsistent with the amount of cocaine for which he was responsible.

The base offense level under the Guidelines for cocaine conspiracy and possession offenses depends upon the quantity of cocaine involved in the crime. *See* U.S.S.G. § 2D1.1(a)(3). At the sentencing hearing conducted on January 22, 1991, as well as in written objections to the pre-sentence report, Duarte claimed that he could be held accountable only for the 1.177 kilograms of cocaine seized at the Exel Inn, a quantity corresponding to a base offense level of 26. The government disagreed. While conceding that it had seized only 1.177 kilograms, it pointed to agent Hehr's testimony that the drug notes demonstrated that Duarte had control over $117,000 of cocaine. Since the going price for cocaine at the time of Duarte's offense was approximately $20,000 per kilogram, the government reasoned, Duarte was actually responsible for over 5 kilograms of cocaine, and hence deserved a base offense level of 32. (The government presented no other evidence linking Duarte to 5 kilograms of cocaine.) The pre-sentence report, using different price data but similar analysis, came to the same conclusion.

The district court agreed with the government, and assigned Duarte a base offense level of 32. Sentencing Tr. at 20–21. The court, following the pre-sentence report, also found that Duarte supervised the conspiracy, and hence imposed a 2 point upward adjustment under § 3B1.1(c). (Duarte does not challenge this upward adjustment here.) For somebody with Duarte's criminal history category of I, a total offense level of 34 corresponds to a sentencing range of 151–188 months. The district court sentenced Duarte to two concurrent 180 month terms. Had the court assigned Duarte a base offense level of 26, and hence a total offense level of 28, his sentencing range would have been 78–97 months.

Our review of sentences imposed under the Guidelines is deferential. We will uphold a sentence so long as the district court correctly applied the Guidelines to findings of fact that were not clearly erroneous. *United States v. Vopravil*, 891 F.2d 155, 157 (7th Cir.1989). Nonetheless, we agree with Duarte that the court's selection of a base offense level of 32 was improper, and rest our holding on two independent grounds. First, the court incorrectly applied the Guidelines because it made no factual finding—as, we explain below, it must—that the $117,000 worth of cocaine transactions recorded in the drug notes were part of the "same course of conduct or common scheme or plan" as the counts of conviction. Second, the court's factual determination concerning the amount of cocaine corresponding to $117,000 rested upon an insufficient foundation, and hence was clearly erroneous. We explore each of these grounds in turn.

### A.

Count I of the indictment charged that "from on or about June 15, 1990 to on or about June 29, 1990, the exact dates being unknown, in Milwaukee in the State and Eastern District of Wisconsin, and elsewhere," Duarte conspired with others "to distribute *in excess of one (1) kilogram* of cocaine." Superseding Indictment, 9/11/90, at 1 (emphasis supplied). Count II charged that "on or about June 22, 1990, in the State and Eastern District of Wisconsin," Duarte "possess[ed] with intent to distribute *in excess of 1 kilogram* of cocaine." *Id.* at 2 (emphasis supplied). We will refer to these counts collectively as "the Milwaukee conspiracy."

The government chose not to indict Duarte for conspiring to distribute or for possessing in excess of *5 kilograms* of cocaine, although it had the option to do so under the relevant statutes. *See, e.g., United States v. Jewel*, 947 F.2d 224 (7th Cir.1991) (indictment charged conspiracy to distribute over 5 kilograms of cocaine); *United States v. Macias*, 930 F.2d 567, 570 (7th Cir.1991) (indictment charged conspiracy to distribute 8 kilograms of cocaine). Thus, in holding Duarte responsible for over 5 kilograms of cocaine, the district court imposed sentence on the basis of a crime more serious (for sentencing purposes) than the crime of which Duarte was convicted.

We have held on numerous occasions that this practice, referred to here as the "aggregation rule," is acceptable, even mandated, under §§ 1B1.3(a)(2) and 3D1.2(d) of the Guidelines. These sections, read together, provide that a district court must increase a defendant's base offense level to account for "relevant conduct," which includes drugs from any acts that "were part of the same course of conduct or common scheme or plan" as the convicted offense, regardless of whether the defendant was charged with or convicted of carrying out those acts. *United States v. Franklin*, 902 F.2d 501, 504 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 274, 112 L.Ed.2d 229 (1990). We have applied the aggregation rule to a wide variety of unconvicted conduct. *See, e.g., United States v. Eske*, 925 F.2d 205, 207 (7th Cir.1991) (permitting increase based upon uncharged activities to which defendant stipulated in plea agreement); *United States v. Fonner*, 920 F.2d 1330, 1332 (7th Cir.1990) (permitting increase based upon conduct with which defendant was charged, but acquitted); *United States v. Ebbole*, 917 F.2d 1495, 1495 (7th Cir.1990) (permitting increase based upon drugs from uncharged and unadmitted activities); *United States v. Fischer*, 905 F.2d 140, 141 (7th Cir.) (permitting increase based upon uncharged activities alleged by prosecutors and admitted to by defendant at sentencing hearing), *cert. denied*, —— U.S. ——, 111 S.Ct. 433, 112 L.Ed.2d 416 (1990); *United States v. Salva*, 902 F.2d 483, 488–89 (7th Cir.1990) (permitting increase based upon amounts from counts dismissed pursuant to plea agreement).

It is rather obvious that the aggregation rule grants the government a fearsome tool in drug cases. It permits prosecutors "to indict defendants on relatively minor offenses and then seek enhanced sentences later by asserting that the defendant has committed other more serious crimes for which, for whatever reason, the defendant was not prosecuted and has not been convicted." *Fischer*, 905 F.2d at 142; *see also Ebbole*, 917 F.2d at 1501. This advantage derives from the arbitrage-like quality of criminal trials—prosecutors must prove beyond a reasonable doubt all elements of the crimes charged in the indictment, but, once having garnered a conviction, need only prove by a preponderance of the evidence facts alleged at sentencing. *See Fonner*, 920 F.2d at 1333; *Ebbole*, 917 F.2d at 1497.

■ Yet the aggregation rule has its limits. As we just observed, to increase a defendant's base offense level for uncharged or unconvicted activities, a district court must first find—by a preponderance of the evidence—that those activities were "part of the same course of conduct or common scheme or plan" as the convicted offense. While some of our cases are admittedly a bit vague as to what is required of district courts by way of factual findings, *see, e.g., Franklin*, 902 F.2d at 504; *Vopravil*, 891 F.2d at 158, more recent cases indicate that a district court should explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its finding that the unconvicted activities bore the necessary relation to the convicted offense. *See Jewel*, 233–235; *United States v. Edwards*, 945 F.2d 1387, 1399–1400 (7th Cir. 1991); *United States v. Morrison*, 946 F.2d 484, 501–502 (7th Cir.1991); *United States v. White*, 888 F.2d 490, 500 (7th Cir.1989); *see generally Jewel*, at 235–236; *United States v. Sullivan*, 916 F.2d 417, 420 (7th Cir.1990); *White*, 888 F.2d at 495; *United States v. Herrara*, 878 F.2d 997, 1002 (7th Cir.1989).[6]

■ With these principles in mind, we conclude that Duarte's sentence runs afoul of the aggregation rule. Duarte, to reiterate, was charged and convicted of conspiracy and possession offenses involving in excess of one kilogram of cocaine, occurring in Wisconsin "and elsewhere," and

---

**6.** Such a statement is, of course, unnecessary if the base offense level corresponds to the amount of drugs charged in the indictment. Since the jury, in convicting, finds the relevant alleged facts proven beyond a reasonable doubt, it would be redundant for the sentencing judge to examine the same facts under the less demanding preponderance of the evidence standard.

taking place approximately from June 15, 1990, until June 29, 1990. The court based Duarte's sentence on the over 5 kilograms of cocaine transactions recorded in the drug notes found in Duarte's wallet at his arrest.

We find no instance in the record where the district court explicitly found that the transactions recorded in the drug notes were part of the "same course of conduct or common scheme or plan" as the Milwaukee conspiracy. In its Statement of Reasons supporting the sentence, the court adopted the factual findings and the Guidelines application in the presentence report, and noted further that both the trial and the sentencing hearing had convinced it that Duarte "was accountable for at least 5 kilograms of cocaine." However, the only testimony tying Duarte to 5 kilograms of cocaine came from Agent Hehr, and Hehr never linked the drug notes to Duarte's activities in Milwaukee. *See* Tr. at 126–38; Sentencing Tr. at 15–19. Similarly, those portions of the presentence report determining the amount of cocaine for which Duarte should be held responsible did not even allege, let alone find, that the notes were related to the Milwaukee conspiracy. *See* Presentence Report, January 4, 1991, at 7–8, 10.

There is, granted, *some* indication in the record that the court believed Duarte's activities in Milwaukee involved far more than the 1.177 kilograms recovered at the Exel. But its comments on this matter are far too vague to constitute an explicit finding that the transactions recorded in the drug notes were sufficiently related to the convicted offense.[7] And this is not a case where the contents of the drug notes permit us to give the district court the benefit

of the doubt. Nothing in the notes suggests that the transactions recorded therein took place in Wisconsin. *Cf. United States v. Lawrence*, 915 F.2d 402, 406–07 (8th Cir.1990) (importance of geographical relationship between convicted offense and relevant conduct). There is no evidence that any of the parties listed in the notes were in Wisconsin or related in any way to the Milwaukee conspiracy. *Cf. id.* at 407 (important that similar parties involved). Finally, the notes give no hint as to the date or dates of the transactions they record. *Cf. id.* at 406–07 (importance of temporal relationship); *White*, 888 F.2d at 500 (same); *United States v. Vazzano*, 906 F.2d 879, 884 (2d Cir.1990) (same). That the notes were found in Duarte's wallet at the time of his arrest is not very probative of the fact that they were composed on or around June 1990—the government's attorney, in response to a question posed at oral argument, acknowledged that he himself had not cleaned out his wallet for several months.

In sum, the fact that Duarte had once dealt 5 kilograms of cocaine—a fact, as we explain below, that is in doubt—is not enough to assign him a base offense level of 32 in this case. We reiterate that to warrant aggregation, the government must demonstrate, and the court must find, that this cocaine was "part of the same course of conduct or common scheme or plan" as the Milwaukee conspiracy. *See White*, 888 F.2d at 500 ("[o]ffenses of the same kind, but *not* encompassed in the same course of conduct or plan, are excluded" from consideration at sentencing). We doubt that it can do so based upon the facts in evidence at this point. There is little, if anything, to suggest a temporal, geographical or any

---

**7.** At the sentencing hearing, the court stated:

> [T]he law is clear that when you are dealing with a drug situation, a conspiracy situation, the totality of the cocaine involved is what determines the dimensions of the base offense level. . . .
>
> Now, the Court here is faced with a case where I have to draw inferences from those things which were adduced at the trial, and it was a short trial. There was not a lot of physical evidence. And you've heard a little bit of the explanation which was considerably

> more detailed and was very convincing, I thought, at the trial of Agent Hehr. And I also would note that a pager is consistent with heavy dealing in cocaine. I would note that there was a reference during the trial to the number of trips that this man had taken from New York to this area and the Chicago area. . . . Therefore, the Court . . . would decline to change the base offense level which as calculated in the presentence report investigation was 32.

> Sentencing Tr. at 20–21.

other relationship between the Milwaukee conspiracy and the transactions recorded in the drug notes. Nonetheless, we reserve judgment and give the government the opportunity to prove its case on remand.

### B.

■ We also question the district court's determination that the $117,000 of cocaine transactions in the drug notes corresponds to 5 kilograms. "Ascertaining the quantity of drugs involved in an offense for the purpose of sentencing is a factual determination subject to the clearly erroneous standard." *United States v. Buggs*, 904 F.2d 1070, 1078 (7th Cir.1990). We reverse or vacate under this standard only when " 'on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed.' " *Cagle*, 922 F.2d at 406 (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (internal quotation omitted)). This is such a case.

As noted above, the drug notes did not refer to specific quantities of cocaine—or even, for that matter, to cocaine. Agent Hehr, however, testified that the notes demonstrate that Duarte was responsible for $117,000 of cocaine, with $117,000 representing the amount of money Duarte owed to a supplier. The district court believed this testimony, and, notwithstanding Duarte's challenge, we accept this finding on appeal.

To calculate the amount of cocaine for which Duarte was responsible, the court divided $117,000 by the wholesale price for a kilogram of cocaine. This method is perfectly acceptable under the Guidelines:

> [w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, [and] financial or other records....

§ 2D1.4, Application Note 2; *see also United States v. Gerante*, 891 F.2d 364, 368–70 (1st Cir.1989) (converting $68,000 in cash

into an estimated quantity of cocaine); *cf. United States v. Ferra*, 948 F.2d 352, 354 (7th Cir.1991).

Taking the $117,000 figure as a given, the only independent variable in this calculation is the price term. If the going price for cocaine at the time of Duarte's crime were greater than $23,400 per kilogram, then $117,000 would represent less than 5 kilograms. Alternately, if the going price were less than or equal to $23,400 per kilogram, then $117,000 would represent 5 kilograms or greater. These figures would be trivial but for the fact that they could seriously affect the length of Duarte's sentence. Duarte's total offense level would be 32 (121–151 months) if he is responsible for 3.5–5.0 kilograms of cocaine, but 34 (151–188 months) for 5.0–15.0 kilograms.

In sentencing Duarte in the 5–15 kilogram range, the district court clearly relied upon price data from two sources: the presentence report and Agent Hehr's testimony at the sentencing hearing and at trial. *See* Sentencing Tr. at 20–21. However, neither of these sources, as the following analysis demonstrates, supports the court's factual determination.

The only price data in the presentence report reads as follows: "A confidential source in New York indicates a kilogram of cocaine presently costs $22,000 to $24,000. Thus, five kilograms at New York prices would equal $117,000, the amount of money ... on Mr. Duarte's drug notes." Presentence Report, *supra*, at 7–8, 10. The conclusion of this passage does not follow from its premise. Five kilograms would "equal" $117,000 only if the price for cocaine were $23,400 per kilogram; given the prices quoted in the report, $117,000 could represent anywhere from 4.875 to 5.318 kilograms of cocaine. Factual determinations under the Guidelines need not emulate the precision of Newtonian physics, but nor may they be based on the kind of nebulous eyeballing employed in the report. The report, we conclude, is ambiguous as to whether Duarte was responsible for over 5 kilograms of cocaine. The district court may not, without further explanation, use

it to assign Duarte a base offense level of 32.

Hehr's testimony is similarly unavailing. At the sentencing hearing, he testified as follows:

> AUSA: [T]here's been an objection raised to the calculations of the total amount of cocaine involved in the conspiracy.... And it becomes rather crucial to sentencing because as you are aware at least 5 cocaine—kilograms but less than fifteen kilograms of cocaine puts you at a level 32. And the Government is alleging that the 117,000 represents $117,000.
>
> .     .     .     .     .
>
> And your testimony at the trial, I think, was that in New York at the time of this offense, why, the street value of one kilogram was $20,000, is that correct?
>
> Hehr: I believe so. I'd have—what was the time period?
>
> AUSA: Judge, I believe the time period would have been around June of 1990.
>
> Hehr: That would be consistent.

Sentencing Tr. at 16–17. The problem with this dialogue is that both participants incorrectly recalled Hehr's testimony at trial:

> AUSA: Back in June of this year, let's say targeting the June 22nd date as a benchmark, do you know how much a kilogram of cocaine would cost?
>
> Hehr: Yes. In June of 1990 a kilogram is going to cost somewhere between [$]24 and 29,000.

Tr. at 117; *see also id.* at 118. (Hehr's statements at the sentencing hearing, while contradictory of his own trial testimony, mirror the price data provided by Detective Gorecki at trial. *Id.* at 81.) For the reasons discussed above, Hehr's inconsistency is important. $117,000 corresponds to 5.85 kilograms if the price of cocaine were $20,000 per kilogram, but only from 4.04 to 4.875 kilograms if the price were between $24,000 and $29,000.[8]

Owing to the variance between Hehr's testimony at trial and at the sentencing hearing, as well as the fact that the district court clearly misapprehended the very trial testimony upon which it purported to rely, we cannot accept its factual finding that Duarte was responsible for 5 kilograms of cocaine. *See United States v. Turner,* 898 F.2d 705, 712 (9th Cir.) (sentencing determination based upon court's mistaken recollection of trial testimony is clearly erroneous), *cert. denied,* —— U.S. ——, 110 S.Ct. 2574, 109 L.Ed.2d 756 (1990). We ordinarily give great deference to the court's judgment when it must choose between one of two inconsistent statements of fact in imposing sentence. *See Buggs,* 904 F.2d at 1080 (upholding district court's finding regarding amount of cocaine involved, where each witness testified as to a different amount). But when the court clearly relies upon one of two contradictory statements offered by a single witness, it should directly address the contradiction and explain why it credits one statement rather than the other.

In conclusion, we find that the district court's determination that the drug notes recorded transactions involving greater than 5 kilograms of cocaine is clearly erroneous. On remand, the government may again try to demonstrate that Duarte was responsible for over 5 kilograms. If it seeks a base offense level of 32, it must also demonstrate, in accordance with this opinion, that the transactions recorded in the drug notes were part of the same course of conduct as the Milwaukee conspiracy.

\*     \*     \*     \*     \*     \*

For the foregoing reasons, Duarte's conviction is AFFIRMED, his sentence is VACATED, and the case REMANDED for resentencing.

---

8. We are rather troubled that the government, in the portion of its brief urging us to uphold Duarte's sentence, alerted us to Gorecki's trial testimony and Hehr's testimony at the sentencing hearing, but *not* to Hehr's contradictory trial testimony. Resp. Br. at 14–15.