**The UNITED STATES, Plaintiff,**

v.

**Frank E. CIHLER, Defendant.**

**No. 98–CR–23.**

United States District Court,
E.D. Wisconsin.

Nov. 2, 1998.

Eric Klumb, Milwaukee, WI, for Plaintiff.

Mark F. Nielsen, Racine, WI, for Defendant.

### STATEMENT OF REASONS AND ORDER

ADELMAN, District Judge.

Defendant Frank Cihler pled guilty to a single-count indictment charging him with possessing approximately one-half kilogram of cocaine with the intent to distribute it. On September 9, 1998, I held part one of Cihler's sentencing hearing, at which both the prosecution and defense presented testimony concerning what amount of drugs should be attributed to Cihler to determine his base offense level. After listening to the testimony, I decided that I would issue a written statement of reasons on the matter and continue the sentencing proceedings until after my statement issued. *See United States v. Acosta,* 85 F.3d 275, 280 (7th Cir.1996) (indicating that district court must explicitly state and support its findings either at the sentencing hearing or, preferably, in a written statement of reasons).

In calculating a defendant's base offense level for sentencing under the United States Sentencing Guidelines, a district court is required to take into consideration not only the types and quantities of drugs specified in the offense of conviction, but also any drugs that were "part of the same course of conduct or common scheme or plan as the offense of conviction"—or in other words drugs that are considered "relevant conduct." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.3(a)(2) (1997)[1]; *Acosta,* 85 F.3d at 279.[2]

---

1. All references to the guidelines are to the 1997 version.

2. The Seventh Circuit has noted the " 'self-evident' unfairness of sentencing a defendant based on uncharged criminal acts," but indicates that the Guidelines nevertheless must be followed in this regard as the Supreme Court has countenanced the practice. *United States v. Beler,* 20

Both the prosecution and defense agree that Cihler's offense of conviction itself involved 499.28 grams of cocaine. Based on defendant's agreements at the plea hearing and the presentence report, the offense of conviction occurred on February 4, 1998, while law enforcement agencies were conducting surveillance of Cihler. Prior to that date, police had received information from two confidential sources indicating that Cihler was due to take delivery of cocaine on February 4. One of the confidential sources supposedly advised officials that on prior occasions Cihler met his supplier at a restaurant, obtained a key to a storage locker at a nearby facility, and then went to the storage locker to retrieve the cocaine.

On February 4, surveilling officers observed the defendant, his brother Victor, and a third party travel to a Chi Chi's restaurant near a mall in Racine, Wisconsin. The surveilling officers then followed defendant and his companions from the restaurant to the mall. Cihler and his companions walked down a hallway in which storage lockers were located, although their activities in the hallway were not observed. They departed a short time later. After the car left the mall, the officers stopped the vehicle. Defendant was a passenger in the front seat. At defendant's feet was a bag containing the 499.28 grams of cocaine. After his arrest, defendant admitted meeting a member of the Outlaws Motorcycle Club at the Chi Chi's restaurant and opening a locker in the mall hallway and removing a package wrapped in a plastic bag.

The question now before me is whether any amount of cocaine should be added to the 499.28 grams as relevant conduct for sentencing purposes. The government wants to add at least another gram, while Cihler believes nothing more should be added. The addition of even 0.72 grams due to relevant conduct makes a difference in the Guidelines calculations. A defendant to whom is attributed at least 400 grams but less than 500 grams of cocaine qualifies for a base offense level of 24, while a defendant to whom is attributed at least 500 grams but less than 2 kilograms of cocaine starts with a base of-

fense of 26. U.S.S.G. §§ 2D1.1(a)(3), (c)(7), (c)(8).

### Motion to Strike Government's Sentencing Memorandum

As a preliminary matter, I am denying Cihler's motion to strike the government's sentencing memorandum (and thus its objections to the presentence report) as untimely. The government filed its memorandum/objections on August 17, allowing defendant adequate time to respond, and I do not believe defendant has been prejudiced in any way.

### Determining Relevant Conduct

 The government bears the burden of proving relevant conduct by a preponderance of the evidence. *See United States v. Jarrett,* 133 F.3d 519, 530 (7th Cir.), *cert. denied,* — U.S. —, 118 S.Ct. 1688, 140 L.Ed.2d 824 (1998). When a defendant is sentenced on the basis of uncharged drug quantities pursuant to section 1B1.3(a)(2), the government's burden of proof is twofold: (1) it must prove by a preponderance of the evidence that the uncharged conduct bore the necessary relation to the offense of conviction, i.e. that it was indeed "part of the same course of conduct or common scheme or plan;" and (2) it must establish by a preponderance of the evidence the quantity of drugs involved in that conduct. *Acosta,* 85 F.3d at 279.

 Two or more offenses are part of a "common scheme or plan" when they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" U.S.S.G. § 1B1.3 comment. (n. 9(A)); *Acosta,* 85 F.3d at 281. Offenses that are not part of a common scheme or plan may nevertheless be part of the "same course of conduct" if there is a sufficient relationship between them "as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 comment. (n. 9(B)); *Acosta,* 85 F.3d at 281. In assessing whether two or more offenses are part of the same course of conduct, the court considers factors such as "the degree of similarity of

F.3d 1428, 1431 n. 1 (7th Cir.1994) (citation omitted).

the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3 comment. (n. 9(B)); *see Acosta,* 85 F.3d at 281 (government must demonstrate "a significant 'similarity, regularity, and temporal proximity [between] the uncharged acts and the offense of conviction'" (quoting *United States v. Sykes,* 7 F.3d 1331, 1336 (7th Cir.1993)). When one of these factors is absent, a stronger presence of at least one of the other factors is required. U.S.S.G. § 1B1.3 comment. (n. 9(B)).

■ Where the drugs actually purchased or seized from the defendant do not necessarily reflect the scope of his or her illegal operation, a district court must "approximate the quantity the controlled substance" at issue. U.S.S.G. § 2D1.1 comment. (n. 12); *United States v. Beler,* 20 F.3d 1428, 1433 (7th Cir.1994). In regard to the government's burden as to actual quantity of drugs, the determination of the amount attributable as relevant conduct "need not emulate the precision of Newtonian physics." *United States v. Duarte,* 950 F.2d 1255, 1265 (7th Cir.1991). But the court cannot simply select a random number or resort to "nebulous eyeballing." *Id.*

### Evidence at the Sentencing Hearing

Before me for consideration are the presentence investigation report, testimony from the sentencing hearing, and six exhibits referenced by witnesses. The presentence report and government exhibit 3, which is a Racine County Metro Drug Unit inventory list, indicate that following Cihler's arrest police searched his apartment as well as the adjacent club house of the High Riders Motorcycle Club, of which defendant was president. In Cihler's apartment officers found various handwritten notes as well as an empty inositol bottle and several loaded firearms.

At the sentencing hearing the government called Drug Enforcement Agency group supervisor and special agent Ray Melick, who testified based on his experience in law enforcement. Melick stated that during the last year street prices in southeastern Wisconsin for powdered cocaine have been stable at about $800 to $1100 per ounce, while 4–ounce quantities—the next usual size up for sales—sell for between $3600 and $4400. In general, said Melick, the per-ounce price goes down as the amount purchased goes up.

According to Melick, while inositol is sold over-the-counter as a hair loss aid or vitamin supplement, it is also the preferred cutting agent used by dealers of powdered cocaine to stretch their profits. In general, said Melick, a cocaine salesperson usually dilutes the powdered cocaine so that the final mixture contains 75% of the real drug and 25% inositol, as a lesser amount of the cutting agent would decrease profits but a higher amount of the inositol would create customer dissatisfaction.

Agent Melick further described how dealers usually "front" cocaine to sell it—in other words they sell it on credit. The common fronting deal, said the agent, is that a dealer will get one-third of the purchase price in cash and will get the remaining two-thirds later, after the purchaser makes his or her own sales.

The remainder of Agent Melick's testimony then focused on three notes marked as government exhibits 1 and 2. Government exhibit 1 is a photocopy of two notes. The originals of the two notes are listed as item 13 on the inventory list logging the items found during the police searches. According to the inventory sheet (and not disputed by defendant), the notes were found together in a cabinet drawer in Cihler's living room. The first note on government exhibit 1 has a number of columns identified by letters or initials, with amounts set forth under the headings. One column shows subtractions from an initial amount and a running balance. Agent Melick described this document as a ledger that he believes is a record of drug transactions because: (1) the column headings are initials so the individuals cannot be identified, (2) if they were club loan records (as defendant argues) he believed they would have been done better, i.e. more formally, (3) the amounts are consistent with sales of drugs, and (4) amounts appear to be owed and are being paid back. While admitting that it is somewhat unusual in notes involving drug transactions to see "odd" end-

ing amounts like "2163," "602" or "5081" as set forth on the ledger, Agent Melick said that this anomaly could be explained by the fact that this ledger looks like a carryover from another page and it appears that payments have been made in amounts like "28."

The second· photocopied note on government exhibit 1 states in full:

I owed you 3800
I gave Puck 1000
Here is $ 2800
─────────────────
 0000

I still owe [scribble] × amount of money But I want 2 more at a good price

According to Agent Melick, this note is consistent with the purchase of four ounces of cocaine because of the rounded $3800 amount.

Agent Melick then looked at government exhibit 2, which appears to be the front and back of an envelope included as part of item 24 on the Racine police inventory list, which indicates the envelope was found on Cihler's dining room table. Melick believed that one section in particular was consistent with drug sales calculations:

3900 4 9900
1000 1 8700
5000 5 1200

Melick believed that these figures translate into "$3900 for four ounces," "$1000 for one ounce," and "$5000 for five ounces." These three amounts add up to 9900, and it appeared to Melick as if $8700 was paid in cash at the time and $1200 was still owed. Other numbers on the envelope appear to be related. Next to the above-quoted numbers is a column of

500
7200
1000

which, obviously, add up to 8700. On the reverse of the envelope is the notation "S1340–1", which Melick thought meant "$1340 for one ounce."

Government exhibit 3 indicates that item 23, the empty bottle of inositol powder, was enclosed within six plastic bags on the counter in Cihler's kitchen. The exhibit indicates that several firearms also were found in Cihler's apartment. Agent Melick testified that the fact that inositol was found in the same apartment as the written notes suggests to him that all of the notes concern drug transactions. The finding of guns in the same apartment suggests the same, Melick said.

After Melick stepped down from the stand, Cihler presented the testimony of Robert Puchter, a High Riders Motorcycle Club member, who stated that he was the "Puck" referenced in the one note on government exhibit 1. Puchter testified that the note (I'll refer to it as the "Puck note") was written by a club member named Luke, and pointed to Luke in the back of the courtroom. According to Puchter, the Puck note references a motorcycle purchase. The High Riders club, he said, purchases motorcycles needing repair, fixes them up, and then sells them to members who do not have bikes. Puchter said he lent Luke $1000 for the purchase of such a bike about a year to a year and a half ago. On cross-examination, Puchter indicated that Luke actually purchased the bike for another member named Face, who did not have a good reputation for repaying money. Puchter stated that the club lends money to members if they need it and that members usually get the money from the club treasurer. Puchter indicated that there is nothing secret about club loans. When the prosecution asked if defendant had ever been treasurer, Puchter said no, "but he's the 'boss,' or he's the president of the club, so a loan has to be okayed through him."

Puchter also described during his cross-examination three spiral notebooks (government exhibits 8, 9, and 10), which, although he did not recognize them from the exterior, he explained appeared to be members' bar tabs at the club and records from their dart games.

Next, defendant's brother John testified that until shortly before defendant's arrest, a club· member named Gary Lambert lived with defendant in defendant's apartment, but defendant kicked Gary out because he was stealing.

As rebuttal, the government called Luke from the back of the courtroom, and Luke Halbur then took the stand. He stated that he borrowed $1000 from Puchter and paid it back about 18 months ago. Face, he said, did not have the money and the repaired motorcycle was coming up for sale, so Luke went to Puchter for the downpayment. According to Luke, Face never fulfilled his obligation so Luke ended up paying the remainder of the purchase price. Luke stated that he in fact wrote the note referencing Puchter as Puck and gave it to defendant when he paid defendant, as president of the club, $2800 cash as the total due. Luke said he paid defendant because he did not know who the club treasurer was, as Luke was just a new or "fresh" member of the club. Although Luke said he had a clear recollection of writing the top portion of the Puck note regarding the dollar amounts, he had no recollection of exactly what he meant when he wrote the bottom part, although it did appear to be his handwriting. On the stand, he said that although he cannot remember his exact intentions, "I want 2 more at a good price" is probably a reference to buying two more motorcycles, as there were other club members who needed bikes and who were upset that Luke and Face had purchased the one they did.

### Court Findings

Based upon the facts set forth in the presentence report and the testimony and exhibits at the sentencing hearing, I find the following.

#### The "Drug Notes"

■ First, the government has shown by a preponderance of the evidence that two of the three notes shown in government exhibits 1 and 2 are "drug notes." The evidence regarding the Puck note is convincing. While I accept Puchter's and Luke's statements that Luke wrote the note to defendant and that Puchter is referenced by use of the word "Puck", I find their testimony as to the purpose of the note to be unbelievable. Luke's testimony in particular regarding its meaning was not credible. I am skeptical of his clear recollection of the top part of the note and such a hazy recollection about the last sentence, and his demeanor on the stand was nervous.

The language of the note itself suggests a fronted drug transaction. "I owed you" is not language commonly used when someone is contemporaneously purchasing a product and providing final payment. The clincher, though, is "I want 2 more at a good price." That is not language that a "fresh" member of the club likely would use in talking to the club president and it is not language that I think would be used for discussing future motorcycle purchases. It is language appropriate for a drug deal, however, especially when it immediately follows the notations for the prior debt. The going-price for the commonly-sold four-ounce size of cocaine ranges from $3600 to $4400, according to Melick, whose testimony I accept on the matter, so 3800 fits right in. As Melick indicated, and again I accept it, the usual front involves about one-third down and two-thirds credit. The payment of $1000 down on the $3800 debt is relatively close to that ratio. And finally, the Puck note, clearly attributed to defendant by both Puchter and Luke, was found in the same apartment as several firearms and the inositol bottle, heightening the suggestion of a drug connection.

In sum, Puchter may or may not have lent Luke $1000 to purchase a motorcycle at one time, but that is not what I find the Puck note references. The preponderance of the evidence shows that the Puck note references a drug debt owed to and payment made to Cihler.

The government also proved by a preponderance of the evidence that the above-quoted columns of numbers from the one side of the envelope also reference prices and quantities of cocaine sold and a partial payment for it. I am persuaded by Agent Melick's opinion on this matter based on his experience as well as his testimony about street prices and my own assessment of the notations. There are three different references: 3900 for 4, 1000 for 1, and 5000 for 5. Having all three of these numbers match up to street prices for cocaine is weighty in my mind. While the $3900 and $5000 at first appear to go against usual practice for pricing as the amount per ounce goes up, the purchases

may have been made in different bundles—for instance one four-ounce package and five one-ounce packages would account for the price difference—or by three different people purchasing at the same time—which is consistent with the notations that seem to indicate the purchase money came in three bundles ($500, $7200, and $1000). The envelope was found on Cihler's dining room table, and I attribute it to him even though he may have had a roommate at one time. And the note was found in relatively close proximity to the inositol bottle and firearms. I thus find that the notes reference three sales made at the same time by defendant: four ounces of cocaine for $3900, one ounce for $1000, and five ounces for $5000. The purchasers likely paid $8700 at the time and owed the remaining $1200.

I am not persuaded by a preponderance of the evidence, however, that the "S1340-1" notation references any drug sale. That number exceeds the range of one-ounce street prices of cocaine described by Agent Melick and it does not match up with any other usual amount for sale. Directly below the number is "L300r1800", and I have no idea what that may reference. Other columns of numbers on that side of the envelope have not been specifically argued by the government and I find in any event that I cannot say that they more likely than not reference anything in particular at all.

The evidence regarding the ledger is weaker than the other two documents. I find that the government has not proved by a preponderance of the evidence that it too references drug transactions. Although, as Agent Melick pointed out, the column headings on the ledger are initials rather than names, which helps in hiding identities, often such headings can just be short-hand—like many column headings in recording Scrabble scores or Rummy 500 points. Puchter testified that although club loans were made through the club treasurer, Cihler nevertheless had to okay them, and I accept Puchter's testimony as true on that fact. More importantly, the numbers on the ledger itself just do not match up with street prices and are not consistent, as they range from a high of 5081 to lows of 100, 80, and 50, which would mean

sales to certain persons of more than five ounces would be kept on the same books as sales of amounts as small as one-half gram. These low numbers especially appear out of place, as do the non-zero endings. While I agree with Agent Melick that this appears to be a continuation ledger, his suggestion that these "odd" numbers such as 2163 and 1 5081 could be explained by the fact that the creditor here seems to accept payments such as $28 just does not raise the evidence to a preponderance standard. Those unusual endings are inconsistent with usual drug records, and it appears unlikely to me that someone owing in excess of $5000 on a drug debt would be paying off the debt using one-dollar bills.

I note that neither am I convinced that this ledger has anything to do with the bar tab books. While defendant attempted to match the amounts under "SUN" on the ledger to the "Sonny" page in the bar tab books, the numbers do not, in fact match. While the ledger shows *decreasing* amounts of 28, 70, 50, and 50, which look like *payments* as they each reduce the running total accordingly, the bar tab book shows *increasing* bar tab *running totals* of $28.50, $70.50, $50.50, and $58.50, after amounts were added to the prior totals.

But it is not defendant's burden to convince me that the ledger is in fact related to the bar tabs. It is the government's burden to show by a preponderance of the evidence that the ledger documents credit transactions that are drug related. Based on what has been presented to me, I do not know what type of transactions this ledger represents. And if I cannot say that more likely than not the ledger documents drug transactions, the government loses on the issue.

■ Although I find that the Puck note and one set of notations on the envelope evidence drug transactions, I also find that the government has not proved by a preponderance of the evidence that the amounts of cocaine described in the drug notes are relevant conduct. The fact of a defendant's participation in other drug transactions does not itself establish the required relationship between those earlier transactions and the offense of conviction, which is the central issue

under section 1B1.3(a)(2). *United States v. Patel,* 131 F.3d 1195, 1204 (7th Cir.1997).

I find that any offenses referenced by the drug notes were not part of the "same course of conduct" with the offense of conviction; in other words they did not constitute "a single episode, spree, or ongoing series of offenses." Cihler was arrested in a car following a meeting at a Chi Chi's restaurant and a visit to a mall during which Cihler obtained a half-kilo of cocaine. The drug notes were found in Cihler's apartment and reference sales of cocaine in smaller one-ounce to five-ounce amounts. The government presented absolutely no evidence tying any identifying marks in the drug notes to the person from whom Cihler obtained the 499.28 gram (about 17.5 ounce) package, or suggesting that the drug notes evidence transactions even similar to the offense of conviction. Other than the fact that the notes were obviously written prior to the search of Cihler's residence, and that Luke (whose testimony I disregard anyway) said he wrote the Puck note about a year and a half ago there has been no evidence about when the notes were written or the regularity with which the referenced sales occurred. *See Duarte,* 950 F.2d at 1264 ("That the notes were found in Duarte's wallet at the time of his arrest is not very probative of the fact that they were composed [on or about the same time]."). Thus, I find that there has not been demonstrated any similarity, regularity, or temporal proximity between the transactions of the drug notes and the offense of conviction.

In regard to "common scheme or plan," the two drug notes do not indicate any commonality with the two "accomplices" in Cihler's car when arrested or the Outlaw at Chi Chi's. Puchter and Luke apparently were not involved in the Chi Chi's events, and the envelope notations do not specify that they are related to any particular individuals at all. There was no common "victim". The drug notes suggest nothing regarding *modus operandi.* And while the drug notes and the offense of conviction all do evidence a general purpose of illegal drug activity, I believe that the government has failed to show any real commonality of purpose constituting a common scheme or overall plan under the Guidelines.

### The Empty Inositol Bottle

■ Neither has the government proved relevant conduct based upon the inositol bottle. I accept Agent Melick's testimony that inositol is a commonly used cocaine cutting agent. *See also United States v. Taylor,* 72 F.3d 533, 536 n. 3 (7th Cir.1995) ("Inositol is a white, powdery vitamin compound commonly used as a cutting agent for cocaine."). But assuming, *arguendo,* that I could correlate the empty bottle of inositol to some certain weight of cocaine, the empty bottle likewise cannot be considered part of the same course of conduct nor does it suggest any common scheme or plan. There is no evidence whatsoever about when the bottle was used or for what purpose—or even why it was enclosed in six baggies. As it was empty, it obviously was not going to be used to cut the cocaine in the package Cihler picked up at the mall. There thus is no temporal proximity, similarity, regularity, or commonality indicated by the bottle at all.

### The Informants' Information on Prior Purchases

■ And finally, while the presentence report does reflect the government's recitation of what one or two confidential informants relayed to law enforcement officials prior to the events of February 4, I find that the government does not come close to the preponderance standard regarding either quantity of cocaine involved or relation to the offense of conviction.

As stated above, the presentence report indicates that law enforcement officials were tipped off about Cihler's February 4 actions by two confidential sources, one of whom described Cihler's similar activities on prior occasions. Also in the record is the affidavit of Bureau of Alcohol, Tobacco and Firearms special agent Jay Quabius, (*see* R. 20, attachment 2), which sets forth his knowledge about the informants' reliability.

■ Importantly, there has been little to no evidence on what amounts of cocaine Cihler actually may have previously purchased using such similar methods—certainly not

enough evidence to avoid "nebulous eyeballing." The relevant question "is not whether defendant engaged in other sales, but rather, how much cocaine was involved." *Beler*, 20 F.3d at 1436. Even a determination that a defendant's drug activity was substantial does not translate into a specific drug quantity finding, which is the ultimate issue for sentencing purposes. *Id.* (citing *United States v. Miele*, 989 F.2d 659, 668 (3d Cir. 1993)). Agent Quabius's affidavit merely reflects that the confidential informants told authorities that on February 4 Cihler was "supposed to get another delivery" or "take delivery of a quantity of cocaine." (R. 20, attachment 2 at ¶¶ 4, 5.) Based on this information, I can no more say that such prior amounts added up to one kilogram than that they totaled 0.5 gram or 10 kilograms. The government thus has failed to meet the preponderance standard as to quantity of cocaine involved in any prior conduct described by the informants.

In addition, in regard to "same course of conduct" I have no evidence before me indicating temporal proximity or regularity of such acts such that I could consider these prior alleged acts part of the "same course of conduct."

■■■■ In regard to "common scheme or plan" the government attempts to use the confidential informants to establish common purpose or *modus operandi*, as there is no evidence about common accomplices or victims. But the government did not proffer at sentencing any testimony by the informants themselves or by Agent Quabius or other law enforcement officers familiar with the informants. A criminal defendant has a due process right to be sentenced on the basis of reliable information. *Beler*, 20 F.3d at 1432. While I may consider relevant information without regard to the Federal Rules of Evidence, it is crucial that the information upon which I rely in calculating defendant's base offense level has "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *Acosta*, 85 F.3d at 282.

Section 6A1.3's reliability standard must be rigorously applied. *Beler*, 20 F.3d at 1433.

■■■■ Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means. U.S.S.G. § 6A1.3 comment. The magistrate judge determined that the informant's identity here did not need to be disclosed. But the mere fact that the events at Chi Chi's and the mall unfolded as the informants supposedly predicted does not by itself cause me to ignore the fact that I have no basis myself to assess the informants' credibility, demeanor or reliability, or their source of knowledge regarding previous transactions that might have occurred. I have little to no specific information at all regarding the informants themselves, when the prior transactions occurred, or whether the informants actually witnessed the transactions first-hand.[3]

The government has conceded that the informants involved in Cihler's case are known to be criminals, at least one has admitted to being involved in drug dealing and the other has admitted to its use, and at least one is a paid informant and has received consideration in the form of non-prosecution. (R. 20, attachment 1 at ¶¶ W, X, BB, attachment 2 at ¶¶ 3, 5.) Information provided by such informants must be subjected to a heightened standard of special scrutiny. *Beler*, 20 F.3d at 1435. In light of this heightened standard, the scant evidence before me regarding the confidential informants just does not convince me that they have sufficient indicia of reliability.

To prove additional relevant conduct cocaine based upon the confidential informants' information, the government needed to give me more regarding these informants, their information, and the quantities of drugs to which they may have attested. It did not, and as a result has not met its burden in proving relevant conduct based upon the confidential informants' information.

---

3. Quabius's affidavit was written in connection with pretrial motions concerning probable cause for Cihler's arrest, rather than sentencing issues, and thus focuses on the confidential informants' reliability as tipsters concerning the events of February 4.

*Conclusion*

The 499.28 gram amount of cocaine puts Cihler very close to the next higher base offense level. The government encourages me to find 0.72 grams somewhere. It urges me to start from the assumption that it did not catch Cihler on his first cocaine purchase—that Cihler must have done this before. But even if I accepted such a position, the evidence provided in the presentence report and at the sentencing hearing nevertheless did not rise to the preponderance standard for finding additional relevant conduct cocaine. Due to the serious deprivations resulting from relevant conduct, determinations must be based on evidence and reasoned analysis, not mere arbitrary pronouncements. *United States v. McEntire,* 153 F.3d 424, 435 n. 15 (7th Cir. Aug.11, 1998) (where district court totaled 99 pounds of methamphetamine and then stated "I am sure we can find another pound somewhere without any difficulty," Seventh Circuit cautioned against such arbitrary pronouncement).

For the above reasons,

**IT IS ORDERED** that defendant's motion to strike the government's sentencing memorandum is **DENIED.**

In addition, I hereby **FIND** that the government has failed to show that any additional amounts of cocaine were "part of the same course of conduct or common scheme or plan as the *offense of conviction.*" Thus no additional amounts are added pursuant to U.S.S.G. § 1B1.3(a)(2). Cihler is responsible for 499.28 grams and thus his base offense level will start out as 24.

The second part of defendant's sentencing is set for **November 5, 1998, at 3:00 p.m.**