# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-3113

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

RUBEN ARROYO,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 99 CR 559—**Wayne R. Andersen**, *Judge.*

———————

ARGUED FEBRUARY 24, 2005—DECIDED MAY 5, 2005

———————

Before FLAUM, *Chief Judge,* and MANION and EVANS, *Circuit Judges.*

FLAUM, *Chief Judge.* A jury convicted defendant-appellant Ruben Arroyo of possession with intent to distribute heroin and conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. §§ 841 and 846. At the sentencing hearing, the government presented evidence that defendant also distributed large quantities of cocaine. Applying the federal sentencing guidelines to both the heroin and cocaine transactions, the district court sentenced Arroyo to 360 months of imprisonment and five years of supervised release. Arroyo now appeals his conviction and sentence.

For the reasons that follow, we affirm the conviction and order a limited remand pursuant to our decision in *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

## I. Background

Federal law enforcement agents began investigating Arroyo with the aid of a confidential informant ("CI") in June 1999. Over a period of about six weeks, officers monitored, recorded, and performed surveillance of 21 meetings and telephone conversations between the CI and Arroyo.

During one of those conversations, on July 11, 1999, Arroyo arranged for his associate Efrain Gamboa-Cazarez ("Gamboa") to deliver a sample of heroin to the CI. Unbeknownst to defendant, the CI immediately turned over this sample to law enforcement. A few weeks later, defendant promised to sell the CI two kilograms of heroin. On July 30, 1999, Arroyo supplied Gamboa with a car equipped with a concealed compartment and sent Gamboa to his drug source, Regalo, to pick up the heroin. Regalo provided only one kilogram, which defendant directed Gamboa to deliver to the CI in a McDonald's parking lot at the intersection of Cermak Road and Harlem Avenue in Chicago, Illinois.

Neither Arroyo nor Gamboa were aware that law enforcement officers were present at the McDonald's and were prepared to arrest the participants once the transaction was complete. As planned, Gamboa arrived at the parking lot, gave the CI the package from Regalo, and told him he would receive the second kilogram after Gamboa took the money to the supplier. Gamboa handed the CI a vinyl package resembling a shaving kit. The CI opened the package and briefly removed a bag containing two smaller plastic bags each holding a white substance. At that point, law enforcement agents emerged and arrested the CI and Gamboa. FBI Special Agent Randall McIntosh seized the package.

Agent McIntosh and Task Force Officer James Washington briefly inspected the package in the parking lot. McIntosh later prepared an arrest report in which he described the contents of the package as "chalky white." After leaving the scene, Washington and FBI Special Agent Holly Meador drove the package to the FBI office downtown where they secured it in an evidence locker. The following Monday, August 2, 1999, Washington and another officer recorded the package in the evidence log. Washington completed a report in which he referred to the substance as a "brown" powder "suspected to be brown heroin." The same day, the package was submitted to a Drug Enforcement Administration ("DEA") laboratory for analysis, where testing confirmed that the package contained 998.1 grams of heroin of varying purity.[1]

On August 6, 1999, after several telephone calls to the DEA, Arroyo turned himself in at the United States Attorney's Office. Represented by counsel, Arroyo agreed to cooperate with the government, and agents held him at a hotel where he provided information to the government. Arroyo admitted to law enforcement agents that he had previously sold cocaine to the CI and that he had arranged the July 30 heroin deal with Efrain Gamboa, Sr., his drug source.

Sometime between 5:00 P.M. on August 10 and 11:15 A.M. on August 11, Arroyo escaped from the custody of federal agents. The FBI arrested him in Yuma, Arizona on August 19, and he was returned to custody in Chicago.

On August 27, 1999, Arroyo and Gamboa were charged in a two-count indictment with conspiring to possess with intent to distribute, and possessing with intent to distribute, approximately one kilogram of heroin. Gamboa pled

---

[1] Agent Washington's report noted a total drug weight of 1,107.3 grams.

guilty but did not agree to assist the government or to cooperate against Arroyo, who proceeded to trial in February 2003.

Over the course of the five-day trial, the government called 13 witnesses who testified about the investigation, the recorded conversations between defendant and the CI, the chain of custody of the drug evidence, defendant's phone calls to the DEA, defendant's post-arrest statement, and his flight. The CI did not testify. Several officers confirmed that they had initialed the arrest report describing the suspected heroin as "white" even though it was later described as "brown."

Arroyo's theory at trial was that he had attempted to "rip off" the CI by providing him with a look-alike substance that was not in fact heroin. He claimed that the white substance that he sent to the July 30 sale was not the same brownish substance that the government ultimately introduced at trial. Defendant offered the testimony of his co-defendant Gamboa that the package seized on July 30 contained a white substance. He also presented the testimony of Albert Charnotta, his sister's former boyfriend, who used to live with Arroyo. Charnotta testified that on July 30, 1999, he saw defendant sitting at the kitchen table placing into plastic bags a white powdery substance that he believed was either baking soda or vitamin B-12.

The jury convicted defendant on both counts and returned a special verdict form finding that defendant had conspired to distribute, or possess with intent to distribute, one kilogram or more of heroin, and that he had actually possessed with intent to distribute between 100 grams and one kilogram of heroin.

The district court conducted a sentencing hearing on July 29 and 31, 2003. The government presented the testimony of one witness, Ricardo Garcia, a convicted drug trafficker who testified pursuant to a written plea agreement with the

government. Garcia had admitted to possessing 150 to 200 kilograms of cocaine and was sentenced to 58 months of imprisonment. Garcia testified that he had delivered large quantities of cocaine on behalf of Arroyo in 1998 and 1999. According to Garcia, Arroyo would supply him with the drugs inside a van, and Garcia would deliver that van to a customer named Jones and assist Jones in delivering the drugs to his customers. Jones would then pay Garcia, and Garcia would deliver the money to Arroyo at his apartment. Garcia testified that he delivered cocaine on behalf of Arroyo five or six times and that he had delivered marijuana once. The district court credited Garcia's testimony and sentenced Arroyo based on a total drug quantity of one kilogram of heroin and 50 kilograms of cocaine (one delivery of 30 kilograms, and four additional deliveries of five kilograms each).[2] This drug quantity resulted in a base offense level of 36. Based on a two-level enhancement for obstruction of justice and a criminal history category of V, the guidelines yielded a sentencing range of 360 months to life. The court sentenced defendant to 360 months.

## II. Discussion

Arroyo raises several issues with respect to both his conviction and sentence. First, he argues that the district court

---

[2] The district court emphasized that it believed it was giving defendant "the benefit of every doubt" in calculating the drug quantity, acknowledging that Arroyo was likely responsible for an even higher quantity. (Sent. Tr. at 103.) The court stated:

I have no doubt sitting here that there was a lot of other drug transactions that Arroyo was involved with that have not been made subject to this . . . [b]ut I have no particular desire to force the Government or myself or the Probation Office to try to get hard evidence to get it above the level 36, which is a pretty steep level given the real terms of his life anyhow.

(*Id.* at 104.)

abused its discretion in refusing to send the drug evidence into the jury room during deliberations. Arroyo also contends that the district court abused its discretion in excluding from evidence an IRS memorandum that he asserts would have corroborated his defense. With respect to his sentence, defendant claims that the district court applied the guidelines incorrectly by including the cocaine in its calculation of drug quantity without explicitly tying this evidence to his offense of conviction. Finally, defendant argues that his sentence violates the Sixth Amendment as interpreted by the Supreme Court in *United States v. Booker*, 125 S. Ct. 738 (2005) and seeks a remand pursuant to *Paladino*. We address each of Arroyo's arguments in turn.

## A. Drug Evidence

During the trial, a court security officer showed the jury the drug evidence by holding the exhibit in his hand as he walked in front of the jury. On the third day of the trial, the heroin was placed in front of the jury on the government's evidence table, and it remained there for the rest of the trial. At the end of the trial, the judge informed the jury that the drugs would not be sent back into the jury room, but that he would work out a process if the jury wanted to see the heroin.

During deliberations, the jury sent out a note requesting to "see the sample heroin and heroin." The trial judge conferred with the parties and considered various options for allowing the jury to examine the drug evidence without compromising the safety of the jury or the exhibit. Over defendant's objection, the judge decided to allow the jury to return to the courtroom to view the evidence in the presence of the judge, counsel, and FBI agents.

Defendant contends that the court violated his right to due process by limiting the jury's access to the drug evidence to a "single, inhibited viewing that denied the jury a meaning-

ful opportunity to evaluate and discuss the exhibit's relevant qualities." He asserts that the jury's determination of the authenticity of the evidence—a crucial issue in the case—required the jurors to be able to examine the evidence closely and discuss with each other subtle details such as color and shading.

We afford the district court considerable discretion in the handling of exhibits during the course of a trial as well as during jury deliberations. *United States v. Burrell*, 963 F.2d 976, 982 (7th Cir. 1992). We review the district court's handling of the exhibits for a clear abuse of discretion. *Id.*

Defendant's argument that the district court abused its discretion is based on an unfair characterization of the record. Far from the single, inhibited viewing that defendant describes, the jurors were able to see the heroin during a significant portion of the trial, and upon their request, were permitted to return to the courtroom to observe the evidence again during deliberations. The district judge struck a reasonable balance between allowing the jurors to examine the evidence and protecting them from allegations of misuse or tampering. The jury had ample opportunity to observe and evaluate the evidence critically in light of defendant's argument that the heroin presented at trial was not the look-alike substance he arranged to have delivered on July 30, 1999. We conclude that the district court did not abuse its discretion in handling the jury's viewing of the evidence in this manner.

## B. IRS Memorandum

Defendant also argues that the district court abused its discretion in excluding from evidence a July 13, 1999 memorandum prepared by IRS Agent Alfonso Herrera regarding an interview with the CI. The memo reported that the CI had told Herrera that Arroyo was believed to have "ripped" two kilograms of cocaine during a drug sale. The district

judge concluded that the CI's statement was hearsay and could not be offered for its truth, but indicated that he would consider allowing it in for some other purpose. Defendant then sought the admission of the memo in order to establish the state of mind of the investigating officers. During a voir dire of IRS Agent Christopher Carlson outside the presence of the jury, defense counsel read aloud the portion of the memo in which Herrera reported:

> On July 13, 1999, [the CI] . . . informed that the word on the street is that there is a contract out on Ruben Arroyo's head. There is a $100,000 reward for anyone that kills Ruben Arroyo. Allegedly Arroyo ripped two kilograms of cocaine from . . . a[n] unknown individual during a drug deal.

(Tr. at 111-12.)

Carlson testified that he was aware of the information in the memo but that it did not affect the way in which he conducted the investigation. The testimony of several other officers also revealed that they were either unaware of the contents of the memo or that it did not influence their investigation. The district court therefore found the memo irrelevant and excluded it.

Defendant argues that the district court abused its discretion in concluding that the officers' state of mind was irrelevant. He contends that, because some of the officers were aware of the possibility that the heroin he and Gamboa attempted to sell was fake, they should have conducted a field test on the scene to determine the true identity of the substance. Arroyo also contends for the first time on appeal that the memo was admissible pursuant to Federal Rule of Evidence 801(d)(2) as a statement by a party-opponent and as character evidence under Rule 803(21). Finally, defendant asserts that "not admitting the IRS Memo denied [him] a critical piece of background information and allowed the jury to reach its verdict based on a partial and incomplete version of the facts."

We review the trial court's evidentiary rulings for an abuse of discretion. *United States v. Gant*, 396 F.3d 906, 908 (7th Cir. 2005). The district court did not abuse its discretion in excluding the memo. Arroyo offered only two potential bases for admission at trial: (i) to prove the truth of the matter asserted—that he had in fact "ripped" two kilograms of cocaine from someone in another drug deal; and (ii) to show that the information contained in the memo affected the way the officers conducted the investigation. Because defendant offered the statements in the memo for their truth, the trial court was correct in concluding that the memo contained hearsay. Moreover, defendant has not explained how the officers' state of mind was relevant. Arroyo was permitted to elicit testimony that the officers did not conduct a field test on the heroin; he has not shown why admission of the CI's out-of-court statements regarding defendant "ripping" the cocaine was necessary to further explain the officers' actions.

Defendant raises the arguments that the memo should have been admitted as an admission by a party-opponent and as character evidence for the first time on appeal. Accordingly, defendant has forfeited these arguments, and we review the trial court's decision for plain error. *See Johnson v. United States*, 520 U.S. 461, 466-67 (1997). Before we can correct any forfeited error, we must find: (1) error; (2) that is plain; (3) affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.*

Both of defendant's newly-presented arguments fail. This Court has held that government agents are not party-opponents for purposes of Rule 801(d)(2). *See United States v. Prevatte*, 16 F.3d 767, 779 n.9 (7th Cir. 1994) (quoting *United States v. Kampiles*, 609 F.2d 1233, 1246 (7th Cir. 1979)) ("Because the agents of the Government are supposedly disinterested in the outcome of a trial and are traditionally unable to bind the sovereign, their statements seem

less the product of the adversary process and hence less appropriately described as admissions of a party."). Nor did the memo fall within the reputation exception to the hearsay rule. The statements defendant sought to admit were not related to his character, but rather to a rumor about a specific prior act and others' intentions to harm him. This information does not establish the "[r]eputation of [defendant's] character among associates or in the community." Fed. R. Evid. 803(21).

## C.  Application of the Guidelines

Based on the counts of conviction alone, the sentencing guidelines would have yielded a range of 188-235 months.[3] The district court's enhancement of defendant's sentence based on relevant conduct and obstruction of justice increased Arroyo's sentence significantly. We now know that this sentence violated Arroyo's Sixth Amendment rights because the judge enhanced his sentence on the basis of facts not determined by the jury and applied the guidelines as mandatory. *Paladino*, 401 F.3d at 479 (citing *Booker*, 125 S. Ct. 738).

We put the *Booker* issues to one side for a moment in order to address Arroyo's argument that the district court erred in its application of the guideline governing relevant conduct. Defendant contends that the district court failed to explicitly connect the cocaine evidence with the offense of conviction—conspiracy and possession with intent to distribute heroin. He argues that the court should not have considered this evidence in imposing his sentence.

Because defendant forfeited this issue by failing to raise it below, we review for plain error. The guidelines instruct

---

[3]  A quantity of one kilogram or more of heroin results in a base offense level of 32. *See* U.S.S.G. § 2D1.1.

district courts to calculate sentences based on types and quantities of drugs not specified in the counts of conviction but that were "part of the same course of conduct or common scheme or plan" as the convicted offenses. *United States v. Bacallao*, 149 F.3d 717, 719 (7th Cir. 1998) (quoting U.S.S.G. § 1B1.3(a)(2)). This "relevant conduct" or "aggregation" rule permits sentencing courts to consider quantities of drugs not specified in the counts of conviction provided that "the unconvicted activities bore the necessary relation to the convicted offense." *Id.* (quoting *United States v. Duarte*, 950 F.2d 1255, 1263 (7th Cir. 1991)). "Two or more offenses are part of a common scheme or plan if they are connected by at least one common factor, such as 'common victims, common accomplices, common purpose, or similar *modus operandi.*' " *Id.* (quoting U.S.S.G. § 1B1.3(a)(2), cmt. n.9)). However, "section 1B1.3(a)(2) must not be read to encompass any offense that is similar in kind to the offense of conviction but that does not bear the required relationship to that offense." *Id.* at 719-20. In assessing whether there is a strong relationship between the uncharged conduct and the convicted offense, courts should consider whether the government has demonstrated a significant similarity, regularity, and temporal proximity. *Id.* at 719.

When a district court aggregates drug quantities arising from uncharged or unconvicted relevant conduct for purposes of calculating a defendant's base offense level, we have required the court to "explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its finding that the unconvicted activities bore the necessary relation to the convicted offense." *Id.* at 720 (quoting *Duarte*, 950 F.2d at 1263). However, where it is clear that the district court took into consideration and adopted the facts contained in the presentence report, as well as the government's reasoning concerning those facts, we have upheld the court's decision to handle the uncharged

conduct as relevant conduct, despite the lack of express findings. *Id.* (citing *United States v. Acosta*, 85 F.3d 275, 280 (7th Cir. 1996)).

In *Bacallao*, the district court sentenced defendant based on a drug quantity of 3.3 kilograms of cocaine without making any explicit findings as to how this quantity of cocaine, other than a portion found on or near the defendant's car, constituted relevant conduct. *Id.* at 719. Because the district court did not make any independent findings but instead relied entirely on the information contained in the presentence report ("PSR"), we determined that the PSR itself must explain how the additional quantities were part of the same course of conduct or common scheme or plan as the offense of conviction. *Id.* at 721. Finding nothing in the record or the PSR establishing relevant dates, common victims, common accomplices, or details concerning the manner in which the additional cocaine was acquired and distributed, we vacated the sentence and remanded for resentencing, noting that the government would have the opportunity to prove on remand that the additional cocaine transactions were relevant conduct for sentencing purposes. *Id.* at 721-22.

In *United States v. Johnson*, 324 F.3d 875 (2003), we upheld the district court's determination that sufficient differences existed between defendant's state-law drug conviction and his federal charge of distributing crack cocaine to preclude the state offense conduct from being considered relevant to the federal offense. *Id.* at 879. In that case, the district court found that the two criminal enterprises lacked temporal proximity because more than one year elapsed between the offenses. *Id.* Furthermore, the offenses differed in that the state law offense involved a conspiracy to distribute large quantities of powder cocaine while the federal offense charged defendant with acting alone to make an individual sale of crack cocaine. *Id.* at 879-80; *see also United States v. Sumner*, 265 F.3d 532, 540-41 (7th Cir. 2001) (where the

drugs charged in the offense of conviction amounted to less than 0.2% of the quantity for which defendant was held accountable, defendant established prejudice under the plain error standard because the district court did not make adequate findings on the record tying the uncharged conduct to the offense of conviction).

In this case, as in *Bacallao* and *Sumner*, the district court made no explicit findings linking the cocaine evidence to the offense of conviction. The PSR also provides no support for such a contention. It merely refers to the cocaine transactions as "relevant conduct" but does not explain the basis for this designation. At sentencing, neither defendant nor the government addressed the question whether the cocaine transactions bore the "required relationship" to the heroin offense, and it appears that both parties, as well as the district court, took this conclusion for granted.

The district court erred in assuming without making a specific finding that defendant's cocaine activity bore the necessary relationship to his heroin conviction. Defendant has not demonstrated, however, that this deficiency rises to the level of plain error.

In *Sumner*, we found that the defendant made an adequate showing of prejudice under the plain error standard where:

> there was a significant temporal gap between the uncharged conduct and the offense of conviction, there was evidence that [defendant] voluntarily ceased the uncharged activity, the uncharged conduct involved a different drug than the offense of conviction, and there was no showing of a common geographical location, common customers, common supplier, common victims, accomplices or *modus operandi*.

265 F.3d at 540-41. The government in *Sumner* argued that the purported relevant conduct and the offense of conviction were temporally proximate but provided no support for this

assertion. *Id.* at 541. Because we also found little or no support in the record demonstrating the similarity of the acts and because the difference in Sumner's sentence was significant (raising his sentencing range from 8-14 months to 121-151 months), we concluded that Sumner had adequately demonstrated prejudice. *Id.*

In this case, by contrast, although the district court did not make explicit findings tying defendant's cocaine distribution to his heroin offense, the record could support the conclusion that the two offenses were part of the same course of conduct. The offenses involved some of the same participants, and defendant used similar means to transport the heroin and cocaine to their respective customers. Therefore, defendant has not shown that this error affected his substantial rights.

### D. *Booker/Paladino* Remand

Because defendant failed to raise a *Booker*-type issue below, we review for plain error. *Paladino*, 401 F.3d at 481. As discussed above, the district court plainly erred in enhancing defendant's sentence based on facts not found by a jury beyond a reasonable doubt and applying the guidelines as mandatory. In order to determine whether the third and fourth prongs of the plain error test have been met, we retain jurisdiction and direct a limited remand to permit the sentencing judge to determine whether he would have imposed a different sentence had he known the guidelines were advisory. *See id.* at 483-84. If the sentencing judge indicates that Arroyo would have received the same sentence, we will conclude that he was not prejudiced by the error, and defendant's plain error challenge must fail. We will then affirm the original sentence, provided it is reasonable. *Id.* at 484. If, on the other hand, the judge decides that a different sentence would have been appropriate, we will vacate the original sentence and remand for resentenc-

ing. *Id.* In either case, the district court should place on the record an appropriate explanation for its determination. *Id.*

### III.  Conclusion

For the foregoing reasons, the conviction is AFFIRMED. We retain jurisdiction and REMAND to the district court pursuant to the procedure set forth in *Paladino*.


A true Copy:

　　　　Teste:


_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—5-5-05