**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 15, 2009
Decided January 7, 2010

**Before**

TERENCE T. EVANS, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 09-1203

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Southern District of Illinois. |
| *v.* | No. 3:08CR30002-001-JPG |
| DEREK DIXON, JR., *Defendant-Appellant.* | J. Phil Gilbert, *Judge.* |

**O R D E R**

Derek Dixon, Jr., was charged with conspiracy to possess and distribute crack cocaine and two separate counts for individual sales of crack. See 21 U.S.C. §§ 841(a)(1) and 846. He pled guilty to the substantive counts, and the government dismissed the conspiracy count. The two sales totaled just 9.4 grams, but for purposes of the Sentencing Guidelines, the district court found that Dixon was responsible for more than 100 grams of crack and sentenced him to a total of 70 months in prison. On appeal Dixon argues that drug transactions other than those in the two counts of conviction should not have been included in the quantity calculation. We affirm.

The government initially charged Dixon for conspiring with Mervyn Butler to distribute crack in Mt. Vernon, Illinois, between January 2005 and March 2007. Dixon allegedly delivered crack to dealers on behalf of Butler, the ringleader. The government later added the two distribution counts based on sales that Dixon made to Craig Brantley in September 2006. As

part of the investigation, the police had carried out a search of Dixon's residence, which linked Dixon to larger-scale drug distribution and to Butler in particular. The officers found drug packaging material for both crack cocaine and marijuana, scales, and cooking equipment with residue that tested positive for cocaine, suitable for cooking powder cocaine into crack. The cocaine cooking equipment in Dixon's kitchen had Butler's fingerprint on it.

After Dixon pled guilty to the distribution counts, the probation officer prepared a presentence report recommending a drug quantity that included additional sales by Dixon to Brantley, as well as deliveries that Dixon had made to others on behalf of Butler. The probation officer's recommendation was based on proffers from Brantley and five other dealers. Brantley told investigators that on at least seven other occasions "during the time frame of the charged offenses," he purchased "eight balls" of crack from Dixon totaling 24.5 grams, but he did not explicitly link those transactions to Butler. The five other dealers, however, did make the connection between Dixon and Butler. Two of the five did not specify the quantity of crack they received from Dixon, but they did describe him as a close associate of Butler, and both told agents that Dixon was Butler's "right hand man." One of them detailed how Butler used Dixon's residence to store drugs and cook powder cocaine into crack. On numerous occasions, the dealer added, either Butler or Dixon met him there when he went to pick up crack. The other three dealers who made proffers to the government were specific about the amounts of crack they received, and each of them said that drugs they ordered from Butler occasionally were delivered by Dixon until his arrest in late 2006. One of those dealers estimated that the deliveries Dixon had made to him alone on four occasions between June 2005 and March 2006 totaled more than 70 grams. In the presentence report, the probation officer also listed the drugs, paraphernalia, ammunition, and large amounts of hidden currency found during a search of Dixon's residence.

The probation officer concluded that 137 grams of crack could be attributed to Dixon for his deliveries to Brantley and the three dealers who placed orders with Butler. Because the crack totaled between 50 and 150 grams, the probation officer proposed a base offense level of 30. See U.S.S.G. § 2D1.1. After applying a recommended three-level reduction for acceptance of responsibility, see U.S.S.G. § 3E1.1, the probation officer determined that Dixon's total offense level of 27 combined with his category I criminal history would yield a guidelines range of 70 to 87 months in prison.

Dixon objected to counting any crack beyond the 9.4 grams involved in the counts of conviction; the remaining transactions, he insisted, lacked sufficient similarity and temporal proximity to qualify as relevant conduct under U.S.S.G. § 1B1.3(a)(2). In response, the government argued that the information in the presentence report evidenced a common scheme or plan because every crack distribution attributed to Dixon had occurred in the same town during the same time frame as the charged conspiracy. The government contended that this was sufficient to allow the district court to infer that Dixon's drug activities were closely linked

to Butler. The district court credited the dealers' proffers, adopted the probation officer's proposed factual findings and guidelines calculations, and agreed with the prosecutor's assessment that Dixon's distributions were connected by a common scheme or plan. The court then sentenced Dixon at the bottom of the guidelines range to 70 months in prison. This appeal followed.

On appeal Dixon concedes that all of the crack he delivered to Brantley – even the 24.5 grams in uncharged transactions – as properly included as relevant conduct. He maintains that his deliveries to other dealers should have been excluded because the transactions were too remote and too dissimilar to the charged deliveries. In the alternative, Dixon contends that the district court did not sufficiently explain its quantity finding so that, at a minimum, a remand is required for further explanation. We review the district court's relevant conduct determination for clear error. *United States v. Jones*, 209 F.3d 991, 994-95 (7th Cir. 2000).

Dixon argues first that his deliveries for Butler were not sufficiently similar or close enough in time to his September 2006 sales to Brantley to be considered relevant conduct. According to Dixon, Brantley never connected him to Butler, and his deals with Brantley involved smaller amounts taken from his "personal stash." Drawing on the most-favorable estimates gleaned from the rough timeline provided by the dealers, Dixon argues that a sufficient temporal connection was also lacking. He points out that at least one of his deliveries of 14 grams could have occurred as early as 2003, and his other deliveries could have taken place up to a year before his offenses of conviction.

When a defendant is convicted of selling drugs, the sentencing court may count as relevant conduct other drug transactions that did not result in conviction if the government proves by a preponderance that the other transactions were part of the "same course of conduct" or "common scheme or plan." See U.S.S.G. § 1B1.3(a)(2); *United States v. Acosta*, 85 F.3d 275, 279 (7th Cir. 1996). Transactions beyond the offense of conviction must be related by at least one commonality, such as accomplices, purpose, or *modus operandi*, U.S.S.G. § 1B1.3(a)(2) cmt. n.9, or a showing that there is sufficient "similarity, regularity, and temporal proximity." *Acosta*, 85 F.3d at 281. Not every instance of drug-related activity qualifies as relevant conduct, *United States v. Ortiz*, 431 F.3d 1035, 1041 (7th Cir. 2000), but minor differences in the defendant's drug activities do not prevent the sentencing court from counting that conduct when calculating the drug quantity, *e.g.*, *United States v. Singleton*, 548 F.3d 589, 592 (7th Cir. 2008); *United States v. White*, 519 F.3d 342, 348-49 (7th Cir. 2008).

Evidence that a period of several months passed between transactions may be enough to break the temporal link in cases where there is little else to connect the deals, see *United States v. McGowan*, 478 F.3d 800, 802-03 (7th Cir. 2007); *United States v. Bacallao*, 149 F.3d 717, 721 (7th Cir. 1998), but even a period of years is not dispositive when the drug transactions are significantly similar, see *United States v. Delatorre*, 406 F.3d 863, 866-67 (7th Cir. 2005). This is

particularly the case when the sentencing court finds that the offense of conviction was just the latest in a series of deals. See *United States v. Stephenson*, 557 F.3d 449, 457 (7th Cir. 2009); *United States v. Wilson*, 502 F.3d 718, 723 (7th Cir. 2007).

Here, the district court's relevant conduct determination was not clearly erroneous. The district court correctly concluded that the proffers connected the counts of conviction to a larger ongoing drug-distribution operation that Butler and Dixon orchestrated in the Mt. Vernon area. Brantley did not need to connect Dixon to Butler specifically in his proffer, and there is no record evidence that Dixon's sales to Brantley came from a "personal stash" separate from the large volume of business he did with Butler. Dixon's drug activities all took place in the same city, involved the same drug, and followed a similar *modus operandi.* Dixon was operating from his residence, where Butler was also involved in cooking powder cocaine into crack. There was a sufficient basis for the district court to find that these commonalities connected Dixon's two charged individual sales to his deliveries as part of a larger common scheme or plan.

We also are not persuaded by Dixon's arguments that the temporal connection was not sufficient. The question of relevant time frame is complicated by the fact that the proffers provided only rough timelines for the uncharged transactions. Based on the estimates most favorable to the government's position, the other deliveries Dixon made for Butler could have taken place between 2005 and 2006. Even if the district court had included just the 70 grams Dixon delivered to one dealer on Butler's behalf between June 2005 and March 2006, this amount added to the 33.9 grams he sold to Brantley put Dixon well within the final range of 50 to 150 grams that the district court used under U.S.S.G. § 2D1.1. The temporal link alone would not be enough to link the charged sales to the larger scheme, but there was much more in this case, as explained above. The district court did not err in finding that Dixon's relevant conduct included distribution of more than 50 grams of crack cocaine.

The district court also provided an adequate explanation for its relevant conduct findings. The district court adopted the findings in Dixon's presentence report, and the transcript from the sentencing hearing reflects the court's agreement with the prosecutor that Dixon's deliveries for Butler were part of a larger drug operation encompassing his sales to Brantley. The district judge was familiar with Butler, the other drug dealers' operations, and the relationships among them after having presided over several related cases. The judge was entitled to draw on that knowledge in evaluating Dixon's culpability and the other dealers' proffers regarding Dixon. Nothing more was required to understand the basis for the quantity calculation. See *Bacallao*, 149 F.3d at 720. There is no need for a remand for further explanation.

Accordingly, we AFFIRM the judgment of the district court.