In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-1180

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BERNELL BRASHER,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 4:21-cr-40070 — **J. Phil Gilbert**, *Judge.*

———————————

ARGUED JANUARY 22, 2024 — DECIDED JUNE 28, 2024

———————————

Before EASTERBROOK, ST. EVE, and JACKSON-AKIWUMI,
*Circuit Judges.*

ST. EVE, *Circuit Judge.* This appeal asks us to hold that some
of Bernell Brasher's past conduct bore too attenuated a link to
his offense of conviction to qualify as relevant conduct at sen-
tencing. But Brasher never raised that issue below, so we re-
view here for plain error. Finding no such error, we affirm.

## I. Introduction

### A. Factual Background

This case started when the Drug Enforcement Administration ("DEA") got a lucky break on October 27, 2021. A confidential source gave them a call with good news: a man named Bacaree Oaks had turned up at the source's Murphysboro, Illinois home that night with a pound of meth for sale. The source had told Oaks he would find a buyer, but then deployed a "ruse" so that he could call DEA. When law enforcement reached the scene for surveillance, they saw Oaks exit the source's home and depart in a vehicle with Bernell Brasher, the appellant here.

Oaks and Brasher returned to the source's residence not long after. Rather than find another buyer immediately, the source suggested that he would take the meth on credit and sell it, paying Oaks and Brasher $5,000 afterward. The three agreed to this deal. But instead of distributing the meth, the source turned it over to law enforcement. Their laboratories tested the package, which turned out to comprise 416.7 grams of 99% pure methamphetamine.

Police later arrested Brasher and Oaks. While police drove Brasher to jail, he told officers he owed money to his own supplier, in Mexico, for about 100 pounds of meth Brasher had out on the street. Officers took note, since the meth sold to the confidential source also came in a pound quantity.

### B. Procedural Background

Less than a month later, on November 17, a grand jury indicted both Brasher and Oaks for conspiracy to distribute methamphetamine under 21 U.S.C. § 841(a). Brasher pleaded guilty, and then the district court ordered a presentence

investigation report ("PSR"). The PSR concluded that for sentencing purposes, Brasher's relevant conduct included four instances of past drug distribution activity. We take them in chronological order.

*The Birmingham Deal*. In February 2018, a different confidential source had flagged Brasher to law enforcement. The source asked Brasher about sourcing meth for a buyer in Birmingham, Alabama. Brasher told the source he could supply four to eight ounces of the drug—then, in March, asked the source to travel with him from St. Louis, Missouri to Birmingham to conduct the deal. That trip never happened, so this conduct added no drug weight to Brasher's tab.

*The Kansas Stop*. A few months later, in May 2018, Kansas Highway Patrol troopers stopped a rental vehicle Brasher was driving. The car had been rented in the name of LaShae Broadway, the mother of Brasher's daughter. The troopers smelled marijuana and searched the car. Inside, they found about $34,000 in oddly stored cash: it had been vacuum sealed, covered in hand sanitizer, and wrapped in plastic. The troopers released Brasher from the scene. No drug weight stemmed from this interaction either.

*The N.N. Sales*. Another confidential source (this one going by N.N.) told police in January 2020 he had bought a pound of meth from Brasher a couple of times. That counted for 907.2 grams (2 pounds) of a mixture and substance containing methamphetamine, which the PSR recommended factoring into Brasher's sentence as relevant conduct.

*The Crontz Conduct*. This last, most important conduct is named for Brasher's co-conspirators, Tammy and Jerry Crontz. On July 15, 2020, a confidential source explained that

the husband-and-wife pair had been selling ice (i.e. pure, crystalline) meth in ounce quantities from their home. They were happy to discuss their supplier with the source: it was Brasher. Later that month, agents got word that a drug shipment would come to Ava, Illinois, addressed to the Crontzes' nephew's home. Just as planned, police saw the nephew pick up the package and deliver it to the elder Crontzes.

The police then arrested and questioned Tammy Crontz. She told them she bought meth from a man she called "Boo," and then the police took her back to her home to search it. On the way there, she informed the officers three pounds of meth had arrived in the mail that same day, representing her largest ever shipment. Typically, Tammy said, the suppliers would pick up drug proceeds at her home. In fact, one supplier had picked up $17,200 just that morning. In the end, police found 882.5 grams (1.95 pounds) of 99% pure ice in her home. Then both Tammy and her husband talked with agents, telling them they had received one to two pounds of ice from Brasher 10 to 15 different times. The PSR, taking the low end of both estimates, later attributed to Brasher 10 pounds (or 4,536 grams) of a mixture containing methamphetamine. Tammy told police, too, that she had shipped about $15,000 in cash to Brasher in San Diego.

Agents also intercepted four calls between Tammy and Brasher. The two discussed the $15,000 shipment—Brasher did not have it because agents had seized it—as well as a future shipment of cocaine and ice. Brasher surmised that law enforcement had seized the package and agreed with Tammy to talk in person on August 4. Meanwhile in Ava, both agents and Crontz affiliates asked the Post Office about Brasher's drug packages. The package the agents wanted was out for

delivery. The Crontzes' son came to the office, too, to ask that the Post Office allow someone else to pick up one of his packages—that one turned out to contain 80 grams of cocaine.

Tammy and Brasher met on August 4, though Tammy had flipped by then to work for the police. They discussed upcoming drug deliveries. The next day, agents picked up another shipment from San Diego, this one addressed to Jerry Crontz. Testing revealed it contained 77 grams of cocaine, 1.1 pounds of marijuana, and 1,575.7 grams of actual methamphetamine.

Tammy talked with agents again on August 13. She explained that before getting into distribution, she had bought on a retail basis: "one-ounce quantities of methamphetamine from Brasher every seven to ten days between December 2019 and April 2020." The PSR again made a conservative estimate, holding Brasher responsible for 6 ounces or 170.1 grams of a mixture and substance containing meth. Things had progressed from there, with Brasher sending meth directly to Tammy as well as packages containing meth and marijuana products to her son's home.

Based on the N.N. sales, the Oaks deal, and the Crontz conduct, the PSR concluded that Brasher's relevant conduct "involved the possession and distribution of 2,874.9 grams of actual methamphetamine; 5,613.3 grams of a mixture and substance containing methamphetamine; 157 grams of cocaine; and 1.1 pounds of marihuana." That amounts to a converted drug weight of 68,756.49 kilograms.

After factoring in the relevant conduct, Brasher had an offense level of 33 with a criminal history category of III, and a corresponding Guidelines range of 168 to 210 months of imprisonment.

Brasher made three objections to the PSR. None is part of this appeal. He cited *United States v. Carnell*, 972 F.3d 932 (7th Cir. 2020), to ask the district court to treat all the methamphetamine officers had recovered as a "mixture and substance containing methamphetamine," with its lighter sentencing consequences. He objected to his criminal history score, asserting (wrongly) that he had not been on probation when he committed his offense. And he objected to the PSR's identifying him as part of the Crip gang.

At sentencing, the district court first confirmed Brasher had no other objections that might affect the Guidelines range. He did not. The court then heard arguments on Brasher's three objections, ultimately adopting the PSR's findings except on the gang affiliation issue. Since Brasher had not raised any question about the relevance of his past conduct, the district court did not address this issue. Brasher took responsibility for his crimes during allocution, including those with the Crontzes, about which he told the court "I'm not going to make any excuses."

The district court sentenced Brasher to 200 months' imprisonment, which fell within his Guidelines range.

Brasher appealed.

## II. Analysis

When Brasher pleaded guilty to his drug crime with Oaks, the district court calculated his base offense level by totaling the drug weight from the above past conduct. This practice finds its roots in U.S.S.G. § 1B1.3(a)(2). Under that guideline, other acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction" enter the mix for calculating a base offense level. *Id.* At the same

time, the mere "fact that a defendant engaged in other uncharged or acquitted drug transactions" is not enough. *United States v. Rollerson*, 7 F.4th 565, 572 (7th Cir. 2021). To bridge the gap between past conduct and the offense of conviction, we look for "significant 'similarity, regularity and temporal proximity'" between the offense of conviction and the other conduct. *Id.* (quoting *United States v. McGowan*, 478 F.3d 800, 802 (7th Cir. 2007)).

From within that framework, Brasher urges that the court should have excluded his past conduct—with the Crontzes, mainly—from the drug weight calculation. Because Brasher did not raise this issue before the district court, we typically would ask first whether that inaction represents waiver or forfeiture. We need not decide that question, though, since any error was not plain. Neither Brasher's substantive theory (that the conduct did not relate closely enough to the offense of conviction) nor his procedural theory (that the district court did not explain the connection) survives plain error's stringent standard of review.

**A. Standard of Review**

Even though Brasher did not preserve this argument, we may consider it under the narrow exception expressed in Fed. R. Crim. P. 52(b): "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." The bounded authority Rule 52(b) confers reflects "the careful balance it strikes between judicial efficiency and the redress of injustice," which in turn explains the prohibition on "unwarranted extension" of the Rule. *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).

To establish plain error, Brasher must "show (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) that had a serious effect on the fairness, integrity, or public reputation of judicial proceedings." *United States v. Haas*, 37 F.4th 1256, 1264 (7th Cir. 2022) (cleaned up); *see also Greer v. United States*, 593 U.S. 503, 507–08 (2021). We can set aside the latter two elements for today because Brasher alleges an error in calculating his Guidelines range, which ordinarily satisfies both. *See Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016) ("substantial rights" prong); *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018) ("fairness, integrity, or public reputation" prong). With that in mind, our focus trains first on whether the district court erred, and second on whether it did so plainly, in a "'clear,' or, equivalently, 'obvious'" way. *United States v. Sykes*, 614 F.3d 303, 312 (7th Cir. 2010) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). "We have never required, however, that the error be obvious to the district court, only that the error was obvious under the law." *United States v. Burns*, 843 F.3d 679, 687 (7th Cir. 2016).

Through that lens we assess Brasher's arguments.

**B. Substantive Theory**

Brasher argues first that his past conduct was too dissimilar from his offense of conviction—and too long before it—to factor into his Guidelines calculation. For Brasher, the gap between these events overwhelms any similarity. The offense of conviction occurred in late October 2021. Meanwhile, the Crontz conduct commenced in December 2019 and concluded in early August 2020. In sum, the last of the Crontz conduct predated the Oaks deal by almost fifteen months. The N.N. conduct reaches a bit further back—seven additional months.

Both timing and similarity factor into our analysis. One comment to the pertinent guideline, U.S.S.G. § 1B1.3(a)(2), cmt. 5(B)(i), calls for related offenses that are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" Building on that foundation, we ask for "a strong relationship" between the two, which the government can establish with "a significant similarity, regularity, and temporal proximity." *Rollerson*, 7 F.4th at 572 (cleaned up). This relationship among similarity, regularity, and temporal proximity works on a sliding scale. "[W]ithout temporal proximity, the government needs a stronger showing regarding the other course of conduct factors, such as regularity or similarity of acts." *United States v. Ortiz*, 431 F.3d 1035, 1041 (7th Cir. 2005).

We agree with Brasher that temporal proximity is lacking here. Indeed, our precedent rules out the contrary conclusion. In one case, we held an eight-month gap was "enough to cast doubt on the relevance of the earlier conduct." *McGowan*, 478 F.3d at 802. The same goes for ten months. *See Ortiz*, 431 F.3d at 1041. Another case even cites out-of-circuit precedent labeling a five-month gap "extremely weak" evidence of temporal proximity. *See United States v. Sykes*, 7 F.3d 1331, 1337 (7th Cir. 1993) (citing *United States v. Mullins*, 971 F.2d 1138, 1144 (4th Cir. 1992)); *see also United States v. Hahn*, 960 F.2d 903, 911 (9th Cir. 1992) (six months). Drawing the line in this vicinity reflects a consensus, for several circuits have held temporal proximity absent—and hence more similarity required—when the gap between two offenses runs past a year. *See United States v. Garcia*, 946 F.3d 1191, 1209 (10th Cir. 2020) (collecting cases).

But that lack of temporal proximity only gets Brasher so far, setting a higher bar for similarity and/or regularity. *Ortiz*, 431 F.3d at 1041. Here, we are satisfied that there was sufficient similarity between the offense of conviction and the uncharged conduct to satisfy the plain error standard. That standard permits reversal only of "'clear,' or, equivalently, 'obvious'" mistakes. *Olano*, 507 U.S. at 734. Mistakes resting on "subtle, arcane, debatable, or factually complicated" distinctions fall outside that set. *United States v. Hopper*, 11 F.4th 561, 572 (7th Cir. 2021) (quoting *United States v. Caputo*, 978 F.2d 972, 975 (7th Cir. 1992)). A truly plain error should run "contrary to well-settled law." *Id.* (quoting *United States v. Salas*, 889 F.3d 681, 687 (10th Cir. 2018)).

The district court did not violate well-settled law by including this relevant conduct. To the contrary, many cases establish that where "the uncharged conduct involved the same principal, the same location, and the same drug" as the offense of conviction, those comparisons "render it similar enough" to be relevant—even if "the charged and uncharged offenses involved different participants and different amounts." *United States v. Singleton*, 548 F.3d 589, 592 (7th Cir. 2008); *see also United States v. Dixon*, 358 F. App'x 745, 748 (7th Cir. 2010) (citing *Singleton* on this point); *United States v. Eccles*, 705 F. App'x 468, 470 (7th Cir. 2017) (same).

Brasher's past conduct and his offense of conviction share all these characteristics. The "same principal" conducted all these deals: Brasher himself. The "same location" features in the Oaks and Crontz deals: a small area of southern Illinois. (To put a finer point on it, the deals went down within a twenty-minute drive of one another. Murphysboro, where the Oaks deal occurred, sits just two towns over from the

Crontzes' Ava abode.) And all the past conduct primarily dealt with the "same drug" Brasher sold the source: ice methamphetamine.

The similarities here go further, surpassing those in the *Singleton* line of cases. Brasher consistently sourced his drugs from Mexico by way of California. He typically sold in pound quantities, even telling officers he had 100 pounds out on the street. And many of the deals involved fronting and middlemen. Certainly, all three of these additional factors—(1) pound quantities of (2) California meth (3) fronted to middlemen—apply to both the Oaks and Crontz deals. With all those similarities, plus the *Singleton* line of cases, we cannot see how "well-settled law" compelled the district court to decide otherwise. *Hopper*, 11 F.4th at 572. Quite the opposite: together, the multitude of similarities here make up precisely the kind of "similar *modus operandi*" the Guidelines hold out as the key to a finding of relevance. U.S.S.G. § 1B1.3(a)(2) cmt. 5(B)(i).

Brasher's response is to assert that many crimes in the Southern District of Illinois share these traits. He contends it proves too much to include past conduct on such commonplace facts. Sure enough, we see our share of methamphetamine cases stemming from downstate Illinois. *See, e.g., United States v. Wright*, 85 F.4th 851, 855 (7th Cir. 2023). And to his credit, Brasher is correct that much of the nation's meth supply originates from Mexico. *See* Drug Enforcement Administration, 2017 National Drug Threat Assessment 77 (2017) ("The [southern border] remains the main entry point for the majority of methamphetamine entering the United States.").

But all this is beside the point. The goal of the Guidelines' limitations on relevant conduct is to parse out which past conduct represents "part of the same course of conduct or

common scheme or plan" as the charged offense. U.S.S.G.
§ 1B1.3(a)(2). What matters is whether the scheme or plan is
common among the *defendant's* activities. While some of the
individual similarities between Brasher's charged and un-
charged conduct might not establish relevance alone, the con-
fluence of several similarities here adds up to a common plan
or scheme and assures us that the district court's findings at
sentencing are free from plain error.

Brasher flags other differences between the Crontz and
Oaks deals: different accomplices, different modes of trans-
portation, different ways of picking up profits, and sometimes
different substances. These differences reflect only the vast
scope of his enterprise—it encompassed many people and
many modalities. Besides, no two deals are exactly alike. As
in *Singleton*, finding three key commonalities makes the two
sets of conduct "similar enough." 548 F.3d at 592. Having
found those commonalities (and more), we need not address
each purported difference.

To the extent Brasher contests the relevance of his sales to
the confidential source N.N., it gains him nothing. Each was a
sale of a pound of Mexican methamphetamine, which is con-
sistent with Brasher's established pattern. And any error on
the N.N. front was harmless. With the N.N. sales, the district
court held Brasher responsible for 68,756.49 kilograms of con-
verted drug weight. Removing those sales leaves nearly
67,000 kilograms. This lower weight would result in the same
offense level: 36. *See* U.S.S.G. § 2D1.1. Even if the district court
had plainly erred here, it makes no difference. The same goes
for the previous ounce-quantity sales to Tammy Crontz,
which totaled 170.1 grams (or, converted under the Guide-
lines' math, 340.2 kilograms). The repeated, pound quantity

sales to the Crontzes dwarf these other transactions, and they closely parallel Brasher's conduct with Oaks.

It was not plain error to consider Brasher's past conduct as relevant and sentence him accordingly.

## C. Procedural Theory

For his next argument, Brasher contends the district court left unmet an obligation to explain why the past conduct was relevant. *See United States v. Sumner*, 265 F.3d 532, 539 (7th Cir. 2001). Recall that the district court never explained why the Crontz conduct was relevant. For good reason: Brasher did not raise the issue. More than that, he disclaimed any intent to dispute the PSR's conclusions beyond three narrow grounds. Now that sentencing is over and the district court can no longer make a record on this topic, Brasher calls on us to decide the issue.

A district court "aggregating drug quantities arising from uncharged or unconvicted relevant conduct for purposes of calculating a defendant's base offense level" should "explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, its finding that the unconvicted activities bore the necessary relation to the convicted offense." *United States v. Arroyo*, 406 F.3d 881, 889 (7th Cir. 2005) (cleaned up).

Still, our law leaves no doubt: even when the district court skips an explanation, "[w]e may nonetheless affirm without a recitation of 'magic words' that reference § 1B1.3(a)(2) if the record supports the district court's conclusion." *United States v. Westerfield*, 714 F.3d 480, 488 (7th Cir. 2013); *see also United States v. Draheim*, 958 F.3d 651, 659 (7th Cir. 2020). There is no error if "the record could support the conclusion that the two

offenses were part of the same course of conduct." *Arroyo*, 406 F.3d at 890. For the reasons above, this record could support just that conclusion.

*        *        *

The judgment of the district court is

AFFIRMED.

JACKSON-AKIWUMI, *Circuit Judge,* concurring. I join the majority opinion because it applies our circuit's current law on relevant conduct to Bernell Brasher's case, but I write separately to highlight what I view as an unfortunate devolution in our circuit's handling of relevant conduct altogether. By watering down our standard for what district courts must do to ensure uncharged conduct is sufficiently related to conduct for which a defendant is convicted, we further increase the power of the government and the courts to punish individuals for conduct for which the government did not attain an indictment or conviction. Sentencing based on relevant conduct is a constitutionally dubious proposition on its own, but our circuit's weakened standard only exacerbates the risk of a constitutional violation. It's time we correct course.

**I**

People unfamiliar with federal sentencing law might find it hard to believe that the law allows sentencing judges to increase a defendant's sentence based on conduct for which the defendant was not charged or convicted. Under this regime, such uncharged, dismissed, or acquitted conduct is called "relevant conduct," which the United States Sentencing Guidelines Manual defines somewhat circularly as "the range of conduct that is relevant to determining the applicable offense level." U.S. SENT'G GUIDELINES MANUAL § 1B1.3 cmt. background (U.S. SENT'G COMM'N 2023). For any given conviction, relevant conduct could include (1) acts and omissions done or willfully caused by the defendant in connection with the offense of conviction, *see* USSG §1B1.3(a)(1)(A); (2) acts and omissions done by others in connection with the offense of conviction as part of "jointly undertaken criminal activity," USSG §1B1.3(a)(1)(B); (3) acts separate from the offense of

conviction that involved the "same course of conduct" or a "common scheme or plan" as the offense of conviction, USSG §1B1.3(a)(2); and/or (4) any harm that results from the acts already described, *see* USSG §1B1.3(a)(3).

Jurists and practitioners alike have been unsparing in their criticism of increasing a sentence based on conduct for which the defendant has not been convicted. Justice Scalia described two decades ago how sentencing a defendant for uncharged conduct could lead to "absurd result[s]." *Blakely v. Washington*, 542 U.S. 296, 306 (2004). Justice Kavanaugh, then on the D.C. Circuit, recognized the regime as a "dubious infringement of the rights to due process and to a jury trial." *United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring). Federal Defenders have denounced the practice as a violation of defendants' Fifth and Sixth Amendment rights, the cause of unwarranted disparities, and a threat to respect for the law. *See, e.g.*, Letter from Marjorie Meyers, Chair, Fed. Def. Sent'g Guidelines Comm., to the Honorable Patti Saris, Chair, U.S. Sent'g Comm'n., at 29–33 (Aug. 26, 2011); Letter from Michael Caruso, Chair, Fed. Def. Sent'g Guidelines Comm., to the Honorable Carlton W. Reeves, Chair, U.S. Sent'g Comm'n., at App'x at 5 n.22 (Oct. 17, 2022).

Even the American Bar Association has rejected the practice. For 30 years, the organization has retained standards for sentencing explaining that "[t]he offense of conviction should be fixed by the charges proven at trial or established as the factual basis for a plea of guilty or nolo contendere." *See* ABA STANDARDS FOR CRIMINAL JUSTICE SENTENCING § 18-3.6 (3d ed. 1994).

In the early days of the Guidelines, our court was similarly skeptical of the relevant conduct enhancement. Shortly after

the Guidelines were promulgated (and still considered mandatory), we observed that the relevant conduct provision "invite[s] the prosecutor to indict for less serious offenses which are easy to prove and then expand them in the probation office." *United States v. Ebbole*, 917 F.2d 1495, 1501 (7th Cir. 1990) (citation omitted). Because of that reality, we "urge[d] prosecutors not to indict defendants on relatively minor offenses and then seek enhanced sentences later" under the relevant conduct guideline. *United States v. Fischer*, 905 F.2d 140, 142 (7th Cir. 1990); *United States v. Bacallao*, 149 F.3d 717, 721 (7th Cir. 1998). The problem was obvious, so we sought to curb its excesses.

To guard against abuse of relevant conduct, our court developed a bright-line rule requiring district courts to "explicitly state and support" their finding that the uncharged or unconvicted conduct bore the necessary relation to the convicted conduct if they applied the enhancement. *United States v. Duarte*, 950 F.2d 1255, 1263 (7th Cir. 1991), *cert. denied*, 506 U.S. 859 (1992). Unfortunately, our commitment to that prophylactic was short-lived.

## II

In *United States v. Duarte*, 950 F.2d 1255, 1263 (7th Cir. 1991), we noted that the relevant conduct regime "grants the government a fearsome tool" by allowing it to increase a defendant's sentence based on conduct for which it did not pursue a charge or conviction. But that tool "has its limits," we said. *Duarte*, 950 F.2d at 1263. One such limit is that the "district court must first find—by a preponderance of the evidence—that those activities were 'part of the same course of conduct or common scheme or plan' as the convicted offense." *Id*. To make that finding, we required district courts

to "explicitly state and support, either at the sentencing hearing or (preferably) in a written statement of reasons, [their] finding that the unconvicted activities bore the necessary relation to the convicted offense." *Id.* (citing *United States v. Jewel*, 947 F.2d 224, 233–35 (7th Cir. 1991); *United States v. Edwards*, 945 F.2d 1387, 1399–1400 (7th Cir. 1991); *United States v. Morrison*, 946 F.2d 484, 501–02 (7th Cir. 1991)). We held that that rule is violated where there is "no instance in the record where the district court explicitly found" that the uncharged conduct and the offense conduct were part of the same course of conduct or common scheme. *Id*. at 1264.

*Duarte*'s rule was straightforward and easy to enforce. Our application of it in *United States v. Jackson*, 983 F.2d 757 (7th Cir. 1993), proves the point. In that case, several defendants were convicted of conspiracy to possess cocaine with the intent to distribute. One defendant pleaded guilty to five kilograms, but the government argued in its presentence report ("PSR") and at sentencing that he should be held accountable for all the cocaine involved in the conspiracy—an additional 45 kilos. *Jackson*, 983 F.2d at 771. The defendant objected and requested an evidentiary hearing to determine if the additional drugs should be attributed to him. *Id.* The district court denied his request and sentenced him based on the full 50 kilos. *Id*. When the case came to us, we vacated the district court's relevant conduct finding because "the district court failed to support its findings in the record." *Id*. at 772.

We reinforced *Duarte*'s rule again in *United States v. Sumner*, 265 F.3d 532 (7th Cir. 2001). There, the defendant pleaded guilty to distribution of cocaine. *Sumner*, 265 F.3d at 535. At sentencing, the government sought the relevant conduct enhancement based on the government's representation

that Sumner had sold cocaine two years before. *Id.* at 537. Sumner did not object to the inclusion of the drugs as relevant conduct, but he did object to the government's calculations. *Id*. at 534–35. The district court overruled his objection and increased his sentence using the relevant conduct guideline. *Id*. at 536. On appeal, Sumner argued that the district court erred by failing to articulate why the earlier conduct qualified as "relevant conduct." *Id*. at 537. We agreed. *Id.* at 540. After reviewing the transcript and PSR (which the district court had adopted), we found that there was "no discussion" in the documents "about the similarity, regularity, or temporal proximity of the uncharged acts and the offense of conviction" other than the naked facts. *Id*. As a result, we held that the district court's "failure to explain the connection between the uncharged conduct and the offense of conviction was erroneous under well-established law," and vacated Sumner's sentence. *Id*.

We have applied *Duarte*'s rule to both overturn and affirm sentencing decisions. Under *Duarte*, when district judges stated their reasons for applying the relevant conduct guideline, we routinely affirmed the sentences the judges imposed without second guessing those reasons. *See, e.g., United States v. Pollard*, 965 F.2d 283, 288 (7th Cir. 1992) (affirming because "the district judge stated his reasons for attributing the marijuana plants grown by [a co-defendant] for sentencing purposes"); *United States v. Cave*, 46 F.3d 1134 n.2 (7th Cir. 1994) (nonprecedential decision) (affirming because the "district court made the necessary findings of fact both at the sentencing hearing and in its written order"); *United States v. Stapleton*, 70 F.3d 117 (7th Cir. 1995) (nonprecedential decision) (affirming because the district court "adequately articulated the

necessary relationship between the offense of conviction and the other activities").

The *Duarte* rule was workable because it struck a balance between allowing prosecutors the benefit of the relevant conduct tool, while also making sure they showed their work. And the burden on district courts was minimal: All the rule required of them was to explain how the uncharged conduct was relevant to the offense of conviction—an explanation the government should have provided anyway.

Despite *Duarte*'s careful balance, some panels of this court began chipping away at its rule. The first chip was carved in *United States v. Thomas*, 969 F.2d 352 (7th Cir. 1992). There, the defendant pleaded guilty to illegal possession of a firearm, possession of cocaine with intent to distribute, and using and carrying firearms during and in relation to a drug-trafficking crime. *Id.* at 353. With an offense level of 12 and a criminal history category of IV, the Guidelines mandated a sentencing range of 21 to 27 months. *Id.* Thinking this was too low, the government loaded up Thomas's PSR with "relevant conduct," and argued that such conduct earned him a Guidelines range of 92 to 115 months. *Id*. at 354. The district court sentenced him to 114 months. *Id*. Its explanation? "I find that . . . . the statements in [paragraph 26 of the PSR] are relevant conduct under the drug charge in this case and that . . . would put the defendant in the offense level 26." *Id*. (citing Tr. at 10–11).

Thomas appealed the district court's paper-thin rationale, but he found no relief here. Even though we observed that the district court "never explicitly found that Thomas' various drug sales were part of a 'common scheme or plan'" and "fail[ed] to provide an adequate discussion of the issue," we nevertheless affirmed because "[t]he district court clearly

adopted the government's reasoning as to the amount of cocaine that should be considered relevant conduct." *Id*. at 355. *Thomas* thus established an exception to *Duarte*: If the district court adopts the relevant conduct alleged in the PSR and the government's explanation of it, the court need not make specific findings on the record.

*Thomas* wasn't the only carve-out to the *Duarte* rule. Soon came *United States v. Acosta*, where we affirmed a district court's application of the relevant conduct enhancement even though the district court made only an "implicit determination" that the uncharged conduct was relevant to the offense of conviction. 85 F.3d 275, 280 (7th Cir. 1996). We called it implicit because "the judge did not expressly find that [the uncharged conduct was] part of the same course of conduct"; he merely "carefully considered whether the information in the [PSR]" was reliable and adopted its findings. *Id*. Still, we determined that we could consider in the first instance "whether the evidence was sufficient to establish that [the uncharged conduct was] part of 'the same course of conduct or common scheme or plan' as Acosta's [offense of conviction]." *Id*. at 281. Ultimately, we affirmed Acosta's sentence because our review convinced us that the evidence "provide[d] ample support for [the district court's] implicit conclusion." *Id*.

*Acosta*'s expansion of *Thomas* was at once subtle and substantial. After *Acosta*, neither the district court nor the government is required to explain how uncharged conduct alleged in a PSR relates to the defendant's offense of conviction. After *Acosta*, we will affirm a district court's application of the relevant conduct guideline so long as "it is clear that the district judge *believed* the required relationship to be present" and *we* can find evidence in the record to support the judge's implicit

finding. *United States v. Patel*, 131 F.3d 1195, 1204 (7th Cir. 1997) (emphasis added). *See also United States v. Arroyo*, 406 F.3d 881, 890 (7th Cir. 2005) (affirming application of the relevant conduct enhancement despite finding that the district court "made no explicit findings linking the cocaine evidence to the offense of conviction" and "[t]he PSR also provides no support for such a contention"); *United States v. Locke*, 643 F.3d 235, 244–45 (7th Cir. 2011) (explaining rule and collecting cases).

Today, the rule in *Acosta* stands as the predominant rule in our circuit. That is so even though we have never formally overruled or abrogated *Duarte*.

### III

This case is an appropriate one to explore our handling of the relevant conduct guideline because the outcome would be vastly different if either *Duarte* or *Thomas* were still acknowledged as the law of the circuit. Faithful application of either of those precedents would require that we vacate and remand Brasher's case for resentencing.

There is no question here that the district court did not "explicitly state and support" its finding that the "relevant conduct" listed in the PSR was sufficiently related to the offense of conviction for purposes of the relevant conduct guideline. *Ante* at 13. In fact, the court did not discuss the similarities or differences between the "relevant conduct" and offense conduct at all—it merely adopted the PSR and increased Brasher's sentence based on the facts contained therein. That sequence of events would not survive review under *Duarte*.

Nor would it survive under *Thomas*. Recall that, under *Thomas*, district courts could avoid their obligation to

"explicitly state and support" their relevant conduct finding so long as they adopted the facts contained in the PSR and the government's theory of how the uncharged conduct relates to the offense conduct. Here, the government provided no explanation connecting the disparate offenses, so the exception articulated in *Thomas* would be inapplicable.

Nonetheless, we affirm because, under *Acosta* and its progeny, we are permitted to search the record and make the connections for the government and the district court. While I believe that the connections here are not particularly strong, I recognize that this case comes to us on plain error review and that we have previously sanctioned relevant conduct findings for connections even more tenuous than those here.

\*     \*     \*

In closing, I join the chorus of critics who have explained that sentencing a defendant based on uncharged conduct is suspect as both a constitutional and policy matter. The United States Sentencing Commission has the authority to address these issues, and it should. Until then, our circuit should ensure that our rules and standards are robust enough to prevent constitutional violations wherever possible. The *Duarte* rule did that. We should find our way back to it.